UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SPECIAL PURPOSE ACCOUNTS RECEIVABLE )
COOPERATIVE CORPORATION and CANADIAN )
IMPERIAL BANK OF COMMERCE, as Agent, )
)
Plaintiffs, )
)
v. ) CASE NO. 00-6410-CIV-GOLD
) /SIMONTON
PRIME ONE CAPITAL COMPANY, L.L.C., )
SIGNATURE AUTOMOTIVE GROUP, INC., and )
THOMAS BORZILLERI, individually, )
)
Defendants. )
_____)

### PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Canadian Imperial Bank of Commerce ("CIBC") and Special Purpose Accounts Receivable Cooperative Corporation ("SPARC") submit this supplemental memorandum in further opposition to Defendants' motion for summary judgment with respect to Count III of their Complaint.

### *Background*

On March 23, 2000, CIBC and SPARC filed a four-count Complaint against Defendants Thomas Borzilleri ("Borzilleri"), Signature Automotive Group, L.L.C. ("Signature") and Prime One Capital Company, L.L.C. ("Prime One") seeking damages and injunctive relief for conversion and tortious interference with Plaintiffs' contractual relationships. Pursuant to a Contracts Credit Agreement entered into between Plaintiffs, on the one hand, and T&W Financial Services Company, L.L.C ("T&W") and T&W Funding Company VIII ("Funding

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
MIAMI NEW YORK WASHINGTON, D.C. ATLANTA PHILADELPHIA MCLEAN CHICAGO BOSTON PHOENIX WILMINGTON
SÃO PAULO FORT LAUDERDALE BOCA RATON WEST PALM BEACH ORLANDO TALLAHASSEE

Company VIII"), on the other, CIBC, as SPARC's agent, obtained a security interest in certain motor vehicle leases ("CIBC leases") and their underlying lease assets (i.e. the leased vehicles).[1] Pursuant to its security interests, CIBC has an immediate right to possession of the lease proceeds, and a right to possess the underlying vehicles at the termination of the lease term. (Complaint at ¶¶ 14-15). As alleged in Plaintiffs' Complaint, Defendants, with full knowledge of CIBC's interests in the CIBC lease proceeds and vehicles, have willfully and deliberately converted that property. (Complaint at ¶ 50). Defendants have further interfered with CIBC's contractual rights and security interests by, among other things, urging lessees of CIBC's leases ("lessees") to remit lease proceeds and return vehicles to Defendants rather than to CIBC's lease servicing agent. (Complaint at ¶¶ 35-40).

Less than three weeks after Plaintiffs initiated this case, Defendants moved to dismiss Plaintiffs' Complaint or, alternatively, for summary judgment. In their motion, Defendants assert that Plaintiffs' conversion and tortious interference allegations are insufficient as a matter of law. Alternatively, Defendants submitted affirmative matter in an attempt to establish a "privilege" defense to Plaintiffs' tortious interference claim. (Motion to Dismiss at 7). Relying on the affidavit of Thomas Borzilleri, Defendants claim their conduct with respect to the lessees was and is permissible because Defendants allegedly have ongoing business relationships with the lessees. In addition, Defendants assert that their interference was and is privileged because T&W purportedly granted Prime One and Signature powers of attorney to service the CIBC leases.[2]

---

[1] The creation and operation of Plaintiffs' securitization facility is explained in greater detail in Plaintiffs' initial Memorandum of Law in Opposition to Defendants' Motion to Dismiss.

[2] By submitting and relying upon the affidavit of Defendant Thomas Borzilleri in support of their privilege defense, Defendants converted that portion of their motion to dismiss into a motion for summary judgment. See Fed. R. Civ. P. 12(b); Brooks v. Blue Cross &Blue Shield of Florida, 116 F.3d 1364, 1371 (11th Cir. 1997).

Plaintiffs responded to Defendants' motion to dismiss and for summary judgment on April 27, 2000. In their opposition memorandum, Plaintiffs established that Defendants' motion to dismiss lacked any legal merit. In addition, in opposition to the summary judgment portion of Defendants' motion, Plaintiffs submitted the affidavits of Zeb Beck and Mark O'Keefe, which established genuine issues of material fact regarding Defendants' purported privilege to interfere with the Plaintiffs' contractual relationships. At the same time, however, Plaintiffs filed a Rule 56(f) motion seeking additional time to conduct discovery and file a supplemental response to the summary judgment motion. On May 22, 2000, the Court entered an order granting Plaintiffs' motion. Pursuant to that order, Plaintiffs deposed certain lessees and the former Data Systems Manager of Prime One and Signature, while simultaneously investigating Defendants' alleged powers of attorney. Although the previously submitted affidavits of Zeb Beck and Mark O'Keefe, standing alone, are sufficient to create genuine issues of material fact precluding summary judgment, the additional discovery obtained by Plaintiffs removes any possible doubt that summary judgment based upon Defendants' privilege defense is patently inappropriate.[3] Accordingly, this Court should now enter an order denying Defendants' motion in its entirety.[4]

---

[3] In response to Defendants' alternative motion for summary judgment, Plaintiffs submit the affidavits of Thomas W. Price, Mark D. O'Keefe, Zeb E. Beck and Kenneth W. McCarthy, Jr. which are contained in the appendix hereto at Tabs 1-4. These affidavits reference and incorporate documents which, combined with the affidavits, not only contest Defendants' argument, but also establish Plaintiffs' security interests in the CIBC leases and vehicles pursuant to the securitization facility, Defendants' wrongful conversion of Plaintiffs' property, and Defendants' interference with Plaintiffs' contractual and business relationships. CIBC also has submitted the deposition transcripts of Charlotte K. Brandon, Defendants' former Data Systems Manager; Cindy Petersen and Robert L. Petersen, corporate representatives of Idaho Car Rental, Inc. d/b/a Thrifty Rent A Car; Martin DeVos, President of DeVos Motor Company d/b/a Budget Rent A Car; and David Rosen, owner of Qualcar Inc d/b/a Thrifty Rent A Car. These depositions further establish Defendants' interference with Plaintiffs' contractual relationships, as well as the insufficiency of Defendants' other arguments.

[4] Plaintiffs incorporate by reference their Statement of Facts contained in Plaintiffs' initial Memorandum of Law in Opposition to Defendants' Motion to Dismiss, along with Plaintiffs' Response to Defendants' Statement of Uncontested Facts Under Local Rule 7.5.

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500  FAX 305-579-0717  www.gtlaw.com
MIAMI  NEW YORK  WASHINGTON, D.C.  ATLANTA  PHILADELPHIA  MCLEAN  CHICAGO  BOSTON  PHOENIX  WILMINGTON
SÃO PAULO  FORT LAUDERDALE  BOCA RATON  WEST PALM BEACH  ORLANDO  TALLAHASSEE

## *Argument*

Summary judgment is appropriate *only* when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the exacting burden of demonstrating the absence of factual issues. Herzog v. Castle Rock Entertainment, 193 F.2d 1241, 1246 (11th Cir. 1999); Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir. 1983). Conversely, "[t]he burden on the nonmoving party is not a heavy one." Warrior Tombigbee Transp. Co., 695 F.2d at 1296 and n.2, quoting, 10A Charles A. Wright, et al., Federal Practice and Procedure § 2727 (1983). Plaintiffs, as the parties opposing this motion, are simply required to show some specific fact or facts (as opposed to general allegations) that present a genuine triable case. See id. In assessing whether Defendants here have met their burden, the Court must view the evidence, together with all the inferences that may reasonably be drawn from the evidence, in the light most favorable to Plaintiffs. Clemons v. Dougherty County, Ga., 684 F.2d 1365, 1369 (11th Cir. 1982). Plaintiffs are entitled to have any factual issues resolved by the trier of fact and accordingly, all reasonable doubts must be resolved in their favor. Id.

Defendants' argument that they are entitled to summary judgment because their contacts with the lessees are "privileged" is two-fold. First, Defendants argue that because they have ongoing business relationships with certain lessees, their conduct with respect to those lessees cannot form the basis for a tortious interference claim. Second, Defendants insist that their collection and retention of vehicles and lease proceeds in which CIBC has an interest is not tortious conduct because it is allegedly authorized by powers of attorney purportedly given by T&W to Prime One and Signature in August of 1999. There are, however, genuine factual issues regarding both these claims. First, there is abundant evidence that Defendants have interfered in

lease relationships in which plaintiffs have no interest whatsoever, and for which Defendants have no arguable claim of privilege. Second, there is equally substantial evidence that the powers of attorney upon which Defendants purport to rely were executed without authority from T&W, and in direct and obvious derogation of explicit directions that had been given to Defendants by T&W at the very time when the powers of attorney were supposedly executed. Accordingly, Defendants' motion for summary judgment must be denied.

## I. THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING THE NATURE OF DEFENDANTS' CONTACTS WITH LESSEES.

Plaintiffs alleged in their Complaint that Defendants have directly interfered with the lessees' relationships with CIBC's current lease servicing agent, Finova Loan Administration ("Finova"), thereby causing Finova to breach its contractual obligations to CIBC. (See generally the Affidavit of Zeb E. Beck ("Beck Aff.") at ¶ 5-15) (Appendix, Tab 3). Nevertheless, Defendants argue that they are immune from liability because they have current business relationships with the lessees. In support of this argument, Defendants assert that under Florida law, to be liable for tortious interference, "the interfering Defendant must be a third party (a stranger) to the relationship." (Motion to Dismiss, p. 6, citing Salit, 742 So.2d at 386; Abruzzo v. Haller, 603 So.2d 1338, 1339-40 (Fla. Dist. Ct. App. 1992)).

However, as Plaintiffs established in their initial opposition, Defendants' authority is simply inapposite. The cases upon which Defendants rely for this proposition concern the issue of whether an employee or agent of a contracting party can be held liable for tortious interference with that contract. The relevant inquiry in a tortious interference case, therefore, is whether Defendants were parties to the contractual relationship with which they allegedly interfered. Id. There is no question that Defendants were not parties to the Contracts Credit Agreement which

established the securitization facility, or to the Servicing Agreement appointing Finova as CIBC's lease servicer (see generally Affidavit of Mark O'Keefe ("O'Keefe Aff.") at ¶ 2-4) (Appendix, Tab 2), nor were they authorized agents of any party to the agreements. (O'Keefe Aff. at ¶¶ 4, 9, 10).

Moreover, the evidence elicited in discovery clearly establishes that Defendants have in fact interfered with lease relationships in which Defendants have no interest.[5] Even after Finova replaced T&W as CIBC's lease servicing agent in December of 1999, Defendants continued to act as servicers of the CIBC Leases. (O'Keefe Aff. at ¶¶ 2, 4). Specifically, Defendants continued to make pay-off quotes; direct the disposition of CIBC vehicles; assist lessees in obtaining duplicate titles in order to sell vehicles; and collect and retain lease payments belonging to CIBC. (See Deposition of Charlotte Brandon ("Brandon Dep.") at 59-63 (Appendix, Tab 5); Deposition of Robert Petersen ("R. Petersen Dep.") at 55-57 (Appendix, Tab 8)). In doing so, Defendants have deliberately thwarted the ability of Finova (CIBC's servicing agent) to collect on those lease obligations. Obviously, the fact that defendants have other independent relationships with the same lessees does not render such interference "privileged."

A number of lessees have testified that Defendants have continued to hold themselves out as authorized servicers of CIBC's leases since December of 1999. For example, David Rosen, owner of Qualcar, Inc., testified that Defendants continued to represent throughout March of 1999 that they had a right to repossess vehicles subject to CIBC's interest. (Deposition

---

[5] In their motion, Defendants submitted no affirmative contentions or proof – other than their patent misreading of Florida's titling statute – contesting CIBC's interest in the leases financed under the securitization facility. Accordingly, CIBC's interest must be accepted for purposes of this motion. In any event, CIBC's interest in the cars and leases (most of which are outside Florida and therefore not even arguably subject to the Florida statute) is amply demonstrated by the affidavits of Thomas Price (¶¶ 4-7) and Mark O'Keefe (¶ 2), as well as the deposition testimony of Charlotte Brandon (passim), including Ms. Brandon's testimony that she was aware that the banks owned the leases and had interests in the vehicles. (Brandon Dep. at 19-20, 56-57).

of David Rosen ("Rosen Dep.") at 169-171) (Appendix, Tab 9). In fact, in April, 2000, Prime One notified Qualcar, Inc. that Defendants' vehicle remarketing agent, PAR North America, was prepared to take possession of those vehicles. (Id. at 55-65). Charlotte Brandon, the former Data Systems Manager for both Prime One and Signature Automotive confirmed in her deposition that Defendants have continued to represent themselves as authorized lease servicers on CIBC leases. (Brandon Dep. at 59-63) (Appendix, Tab 5) (stating that Defendants continued to make pay-off quotes to lessees, accept lease payments from lessees and auction lessees' vehicles). In that regard, Defendants have continued to collect back-end residual payments from lessees following the completion of their leases, make pay-off quotes, arrange for the auctioning of post-lease vehicles, and collect auction proceeds from vehicle auctions. (See id.; R. Petersen Dep. at 55-57).

In addition, Defendants have interfered with CIBC's contractual rights by directing lessees to sell vehicles without Finova's approval and directing those lessees to remit the proceeds of those sales to Defendants. For example, Cindy Peterson, the Controller of Idaho Car Rental ("Idaho") testified in her deposition that in March and April of 2000, after this lawsuit had been filed, Defendants' employees instructed her to sell vehicles leased by Idaho and subject to CIBC's security interests. (Deposition of Cindy Petersen ("C. Petersen Dep.") at 51-52) (Appendix, Tab 7). When Defendants were unable to provide titles for the vehicles that Idaho had sold, Defendants instructed Idaho to apply for duplicate titles from the Idaho Transportation Department. (Id. at 85-86). To facilitate this process, Defendants provided Ms. Petersen with purported powers of attorney to act on T&W's behalf. (Id. at 40; R. Petersen Dep. at 55). Defendants then billed Idaho Car Rental for the back-end payments due under the leases. Charlotte Brandon, Defendants' Data System Manager, testified that Defendants assisted "a

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500  FAX 305-579-0717  www.gtlaw.com
MIAMI  NEW YORK  WASHINGTON, D.C.  ATLANTA  PHILADELPHIA  MCLEAN  CHICAGO  BOSTON  PHOENIX  WILMINGTON
SÃO PAULO  FORT LAUDERDALE  BOCA RATON  WEST PALM BEACH  ORLANDO  TALLAHASSEE

number" of CIBC lessees in obtaining duplicate titles so that they could sell their vehicles. (See Brandon Dep. at 90-91, 96-97 (Ms. Brandon did not specify if all of these titles were for vehicles subject to CIBC's interest.)).

Due to Defendants' representations, certain lessees have refused to allow Finova to sell or take possession of leased vehicles at the end of the lease term. (See Beck Aff. at ¶ 13; Rosen Dep. at 159-160). Defendants have fraudulently asserted that they have an interest in the proceeds from the leases that are subject to CIBC's security interest. Accordingly, a number of lessees, unsure of which company is the legitimate servicer of their leases, have refused to remit vehicle liquidation proceeds to Finova. (Beck Aff. at ¶ 10). For example, Idaho has refused to remit the proceeds from the unauthorized sales of its lease vehicles to Finova due to Defendants' assertion that they have an interest in those proceeds. (See C. Petersen Dep. at 42, 45, & 70-71; R. Petersen Dep. at 54 ).

Defendants have also interfered with CIBC's security interest by advising lessees that they could discharge their lease obligations by simply delivering the leased vehicles to Defendants. (See Deposition of Martin DeVos ("DeVos Dep.") at 27, 29-32, 88) (Appendix, Tab 6). Defendants have also made pay-off or buy out quotes to lessees for amounts less than those due under the leases. (R. Petersen Dep. at 59-62). These types of representations have interfered with Finova's ability to collect the "guaranteed residual value" due to CIBC under the specific lease terms. (See generally Beck Aff.). Pursuant to Defendants' instructions, lessees have sold vehicles for less than their guaranteed residual value, and are now refusing to pay Finova the deficiency between the vehicle's sale price and that value. For example, Dollar Rent A Car of Austin ("Dollar"), which leased approximately 50 vehicles subject to CIBC's security interest, was informed by Prime One that it could sell the vehicles at the end of the lease term at

a price roughly $60,000 below the amount specified in Dollar's lease contract. (See DeVos Dep. at 88-89; Beck Aff. at ¶ 8-10). Dollar subsequently refused to pay Finova this $60,000 deficiency on the grounds that Prime One had authorized the sale and informed Dollar that it would have no further obligation under the lease. (See DeVos Dep. at 136-137; Beck Aff. at ¶ 10). The chairman of Idaho, Robert Petersen, also testified that Defendants assured him that his company would not be held responsible for any shortfalls if vehicles were sold at a price below the vehicles' guaranteed residual value. (R. Petersen Dep. at 21-23, 60-61). As a consequence, Idaho has also refused to allow Finova to auction their remaining vehicles until Finova agrees to release Idaho for any possible deficiencies.

Finally, Plaintiffs have obtained evidence that Defendants have been collecting and withholding proceeds from the sale of vehicles in which CIBC has a security interest. Charlotte Brandon, the former Data Systems Manager for both Prime One and Signature, testified in her deposition that Defendants have collected vehicle liquidation proceeds from lessees and auction houses, and are holding these proceeds in a "reserve" account. (Brandon Dep. at 63-64). Ms. Brandon further testified that Defendants' computer database reflects that CIBC has a interest in these very proceeds. (Id. at 14-15, 19-20). This conversion has obviously interfered with Finova's ability to perform its obligations under the Contracts Credit Agreement and Servicing Agreement to collect and remit vehicle liquidation proceeds to CIBC.

II. **THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING WHETHER DEFENDANTS HAVE VALID POWERS OF ATTORNEY TO ACT ON BEHALF OF T&W.**

Defendants claim that they cannot be held liable for tortious interference because they were authorized to interfere with CIBC's contractual relationships by T&W -- CIBC's

former lease servicer. (Motion to Dismiss at 7). In support of this argument, Defendants have produced two purported powers of attorney allegedly authorizing Defendants "to manage certain leases and motor vehicles" subject to CIBC's security interest. (Id.). These documents appear to have been executed by Paul Luke, a former Senior Vice President at T&W. However, there is a plethora of facts demonstrating that these powers of attorney are not valid or binding, and that Defendants have always been aware that they had no authority to engage in the conduct complained of by CIBC. The issue of whether Defendants had authority to deal with CIBC's lessees is inherently an issue of fact.

### A. The Purported Powers Of Attorney Are Invalid.

#### 1. Paul Luke Lacked Authority to Grant Powers of Attorney to Defendants.

The powers of attorney produced by Defendants, even if genuine documents, are invalid because Paul Luke lacked any authority to grant such powers of attorney to Prime One or Signature. Pursuant to the Contracts Credit Agreement, T&W was appointed to service the leases financed under CIBC's securitization facility, and was therefore responsible for collecting monthly lease payments and vehicle liquidation proceeds from lessees and remitting those proceeds to CIBC. (Price Aff. at ¶ 8). Initially, Prime One worked with T&W to perform many of the servicing duties. (Price Aff. at ¶ 9).[6] For example, Prime One, through Borzilleri, assisted T&W in collecting back-end residual payments due from lessees at the end of the lease term, collecting buy-out payments, arranging for the auctioning of vehicles at lease term, and collecting auction proceeds from the vehicle auctions. By the summer of 1999, however, T&W's

---

[6] Prime One was created as a T&W joint venture with Thomas Borzilleri ("Borzilleri") and Joseph David Pacifico in July of 1998. Until it withdrew from Prime One in December, 1999, T&W held a 51% majority interest in the joint venture. (Price Aff. at ¶ 4).

senior management had decided that Defendants' intervention in servicing was disrupting T&W's account management. (Price Aff. at ¶ 10). T&W therefore decided to establish greater control over its servicing obligations by strictly limiting Defendants' servicing operations. (Price Aff. at ¶12).

Not surprisingly, it is the sworn and unequivocal testimony of Tom Price, T&W's President at the time the powers of attorney were supposedly executed, that Paul Luke had no authority to execute the powers of attorney. (Price Aff. at ¶ 15). The ostensibly broad powers granted by these documents are at complete odds with T&W's efforts to drastically curtail Defendants' participation in T&W's servicing, a policy that was instituted during the very same timeframe in which the powers of attorney were allegedly executed.[7] Moreover, Kenneth W. McCarthy, Jr., T&W's then-General Counsel and Senior Vice President, and the person who would be expected to prepare such legal documents, has also confirmed that he never authorized the powers of attorney upon which Defendants rely, nor did he ever even know the documents existed until after he resigned his executive position with T&W in early 2000. (Affidavit of Kenneth McCarthy, Jr. at ¶ 2) (Appendix, Tab 4). Based on these facts, it is evident that there are genuine factual issues regarding Paul Luke's authority to execute the powers of attorney, and thus regarding the validity of those instruments.

Nor can defendants credibly argue that Paul Luke had apparent authority to grant powers of attorney to Prime One and Signature. By the summer of 1999, T&W had informed Borzilleri that it was going to conduct certain servicing activities that Defendants had previously

---

[7] It is well accepted under Florida law that a corporation will not be bound by the acts of its officer where the officer acts outside of his corporate authority or adversely to the interests or policies of the corporation. See Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Assoc., 117 F.3d 1328, 1338-39 (11th Cir. 1998) ("Florida law prohibits attributing the acts of a corporate officer to the corporation where the officer acts outside of his authority or adversely to the interests of the corporation").

undertaken. T&W further informed Borzilleri that it was going to generally limit Defendants' authority to participate in lease servicing. (Price Aff. at ¶ 10). For example, T&W notified Borzilleri that automobile auction houses would be instructed to forward auction proceeds directly to T&W rather than routing those funds through Prime One. (Id.). In addition, T&W told Borzilleri that T&W, and not Prime One or Signature, would collect all manufacturers' guaranteed residual payments directly from vehicle manufacturers. (Id.). This general change in T&W's policy was reiterated to Borzilleri, in the presence of Paul Luke, on several occasions during the summer and fall of 1999. (Id. at ¶ 15). Accordingly, Defendants knew that T&W was trying to restrict their role in servicing at the very time that Paul Luke allegedly granted them powers of attorney expanding their participation. (Id.).

Although a corporation may be held liable for the acts and representations of the corporate officers that it holds out as possessing authority to bind the corporation, a corporation is not responsible for the unauthorized acts of its officer where the party purportedly relying on the officer's "apparent" authority has notice that the officer lacks such authority. Ideal Foods, Inc. v. Action Leasing Corp., 413 So.2d 416, 418 (Fla. 5th DCA 1982). A third party dealing with a principal's agent must be justified in relying on the agent's apparent authority. Ann. Lease Plans, Inc. v. Silver Sand Co., 637 F.2d 311, 314 (5th Cir. 1981). The third party cannot blindly rely on the agent's representations where circumstances put him on inquiry notice as to the legitimacy of the agent's authority. See Industrial Ins. Co. of New Jersey v. First Nat'l Bank of Miami, 57 So.2d 23, 26 (Fla. 1952). In the present case, Defendants were, at a minimum, on inquiry notice that Paul Luke had no authority to execute powers of attorney that would expand Prime One's and Signature's servicing role, given that T&W's express policy was to curtail that role. (Price Aff. at ¶¶ 10 & 15).

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
MIAMI NEW YORK WASHINGTON, D.C. ATLANTA PHILADELPHIA MCLEAN CHICAGO BOSTON PHOENIX WILMINGTON
SÃO PAULO FORT LAUDERDALE BOCA RATON WEST PALM BEACH ORLANDO TALLAHASSEE

### 2. Any Powers of Attorney that Defendants May Have Had to Act on Behalf of Defendants Were Terminated When Finova Replaced T&W as Servicer.

Regardless of the original validity of Defendants' alleged powers of attorney to act on T&W's behalf, any arguable authority Defendants may have had to service the CIBC leases was necessarily terminated when T&W was terminated as CIBC's lease servicing agent. In early December of 1999, T&W defaulted on its obligations to CIBC under the Contracts Credit Agreement. (Price Aff. at ¶ 11). Accordingly, on December 30, 1999, CIBC exercised its rights under the Contracts Credit Agreement to replace T&W with Finova as its lease servicer. (See Price Aff. at ¶ 12; Beck Aff. at ¶ 2). This transfer of servicing authority effectively terminated any rights that T&W had to service leases originated under CIBC's securitization facility. (Price Aff. at ¶ 12). Because Prime One's and Signature's alleged authority to service leases was necessarily derivative of T&W's authority, Defendants' purported authority was obviously terminated as well. (Price Aff. at ¶ 12).[8] Thus, even assuming arguendo that the alleged powers of attorney were valid when executed, any authority thereunder terminated after December 30, 2000.

### 3. Any Residual Authority that Defendants May Have Had to Act on Behalf of T&W was Expressly Revoked By Tom Price.

Finally, Tom Price has also revoked any arguable authority that Defendants had to act on T&W's behalf. As set forth in Tom Price's affidavit, the powers of attorney upon which Defendants attempt to rely were never authorized by T&W. Nevertheless, when Tom Price learned of the documents in April, 2000, out of an abundance of caution, he wrote to Borzilleri

---

[8] In fact, T&W assigned any and all authority that it may have to service the leases funded under Plaintiffs' securitization facility to Finova in a "Irrevocable Power of Attorney" in which Finova was designated as T&W's true and lawful attorney-in-fact for the purposes of performing all acts and executing all documents necessary and incidental to servicing Plaintiffs' leases. (Price Aff. at ¶ 12).

revoking the powers of attorney. (Price Aff. at ¶ 16, Ex. D). In a letter dated April 12, 2000, Price wrote that Defendants' alleged powers of attorney were, in fact, invalid. (Id.). He further stated that "without acknowledging the validity of the Powers of Attorneys previously executed by anyone purporting to act on T&W's behalf," any and all claimed powers of attorney purportedly granted to Defendants were revoked and therefore terminated from that date forward. (Id.)

### B. Defendants Have Always Known That The Powers Of Attorney Do Not Authorize Them To Engage In The Conduct Complained Of In The Complaint.

There are numerous facts demonstrating that the Defendants knew that their powers of attorney were invalid and did not authorize them to deal with leases or lessees in which CIBC had an interest once T&W was removed as servicer of the leases. Defendants' claim of privilege is therefore disingenuous at best. Borzilleri was informed in December of 1999 that T&W had been terminated as servicer, and therefore consequently knew that any authority that T&W had previously delegated to Defendants, by powers of attorney or otherwise, had likewise terminated. (Price Aff. at ¶¶ 12, 13). Defendants' knowledge that they had no authority to deal with lessees regarding the CIBC leases is further demonstrated by the fact that in January, 2000, Borzilleri approached CIBC to ask permission for Defendants to act as back-end servicer on those very leases. (O'Keefe Aff. at ¶¶ 6, 7). In so doing, Borzilleri expressly acknowledged that absent such permission, he had no right to do so. It was only after CIBC rejected Borzilleri's proposal that Defendants asserted that, in fact, they were authorized to interfere with CIBC's contractual relationships, offering the alleged powers of attorney as a post-

hoc justification for their conversion and interference. These facts alone are sufficient to create factual issues regarding Defendants' claim of privilege.

### *Conclusion*

For all of the foregoing reasons, and for all of the reasons set forth in Plaintiffs' April 27, 2000 Memorandum of Law in Opposition to Motion to Dismiss, Defendants' motion for summary judgment should be denied.[9]

                                          Respectfully submitted,

                                          GREENBERG TRAURIG, P.A.
                                          1221 Brickell Avenue
                                          Miami, Florida 33131
                                          Telephone: (305) 579-0500
                                          Facsimile: (305) 570-0717

                                          -and-

                                          David F. Graham
                                          Holly A. Harrison
                                          Joel M. Hammerman
                                          SIDLEY & AUSTIN
                                          Bank One Plaza
                                          Chicago, Illinois 60603

                                          Attorneys for Plaintiffs

                                          By: _____
                                               C. RYAN REETZ
                                             Florida Bar No. 934062

---

[9]     In their original reply brief, Defendants improperly sought to argue various new grounds that were not contained in their original motion. To the extent that Defendants should attempt to raise any new factual grounds in their forthcoming reply which were not contained in their Rule 7.5 statement, Plaintiffs respectfully request that the Court either decline to consider such improperly-raised contentions or give Plaintifs an opportunity to respond to them in due course.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was served this 13th day of July, 2000 by U.S. mail to

Bruce David Green, Esq.
600 South Andrews Avenue
Suite 400
Ft. Lauderdale, FL 33301

- and -

Joseph A. DeMaria, Esq.
Tew, Cardenas, et al.
201 S. Biscayne Boulevard
Suite 2600
Miami, FL 33131

C. Ryan Reetz