## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

SPECIAL PURPOSE ACCOUNTS
RECEIVABLE COOPERATIVE
CORPORATION and CANADIAN
IMPERIAL BANK OF COMMERCE,
as agent,

CASE NUMBER: 00-6410-CIV-GOLD
MAGISTRATE JUDGE: Simonton

Plaintiff's,

vs.

PRIME ONE CAPITAL COMPANY,
L.L.C., SIGNATURE AUTOMOTIVE
GROUP, INC., and THOMAS
BORZILLERI, individually,

Defendant's.

_____/



## DEFENDANTS SUPPLEMENTAL REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS COMPLAINT FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

Defendant's, **PRIME ONE CAPITAL COMPANY, L.L.C. (Prime One)**,

**SIGNATURE AUTOMOTIVE GROUP, INC. (Signature)**, and **THOMAS BORZILLERI**

**(Borzilleri)**, file herewith this Supplemental Reply Memorandum of Law In Support of their motion

to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted or in

the alternative for summary judgment, and state:

1

## The Claims In General

1. As noted in earlier memoranda, the claims in this action[1] arise out of the two exhibits attached to the Complaint (the Amended And Restated Contracts Sale and Contribution Agreement and the Contracts Credit Agreement) and the claimed, but undocumented, interest of the Plaintiff's in various motor vehicles and motor vehicle leases. All of the claims of the Plaintiff's depend on whether or not the Plaintiff's have either (i) a perfected security interest in the motor vehicles and motor vehicle leases or (ii) an ownership interest in the motor vehicles and motor vehicle leases. Absent the (i) valid transfer of ownership or (ii) perfection of a secured interest in the motor vehicle or the motor vehicle leases, no motor vehicles or motor vehicle leases became subject to the Amended And Restated Contracts Sale and Contribution Agreement and the Contracts Credit Agreement notwithstanding Plaintiff's optimistic, but still undocumented claims, to the contrary.

2. Despite the fact that the Court granted the Plaintiff's additional time to file a supplemental response to the Defendant's motion for summary judgment,[2] the Plaintiff's have not produced a single motor vehicle title showing that any interest in any motor vehicle has actually been transferred to the Plaintiff's, or either of them. Moreover, the Plaintiff's have not produced a single document signed by an authorized representative of the Defendant's transferring or assigning any interest in any motor vehicle lease to the Plaintiff's, or either of them.[3] It would appear that no assets

---

[1]   Conversion of money, conversion of motor vehicles, tortious interference with contractual relationships, and injunctive relief.

[2]   See Order dated July 6, 2000.

[3]   See numbered paragraph 4 below.

2

became subject to the credit facilities out of which Plaintiff's claim their interests arise.[4]

3.  Defendant's have previously pointed out to the Court that one of the affidavits furnished by Plaintiff's affirmatively shows that no titles were ever transferred to Plaintiff's, or either of them.[5]  Similarly, the most recent affidavit of Thomas W. Price shows that any claimed assignments were not valid as these "assignments" were purportedly executed by an officer of T&W, an invalid act utterly inconsistent with the internal management limitations and operational guidelines established by Section 7 of the Agreement of Prime One Capital Company, LLC (copy attached hereto as Exhibit "A").[6]

4. Pursuant to Section 7.1(c) of the Agreement of Prime One Capital Company, LLC (Exhibit "A"), the officers of Prime One were Thomas Borzilleri (CEO), Joseph David Pacifico (President) and Paul B. Luke (CFO/COO).  Section 7.2(b) requires that the majority action of the officers of Prime One for any use of the property of Prime One for any purpose other than as set forth in Section 1.2 (equipment leasing).  Thus, the pledge of assets of Prime One required the act of a majority of the officers of Prime One and no single employee of T&W had authority to encumber assets of Prime One.[7]

---

[4]    See Affidavit of Meryl Barka Newman submitted herewith.

[5]    See affidavit of Zeb E. Beck, Paragraph 9 ("At all times, Finova retained title to the vehicles which are in the name of T&W...").

[6]    This document is referred to in numbered paragraph 4 of the Affidavit of Thomas W. Price (Appendix 1 submitted with the Plaintiff's Supplemental Memorandum of Law) but was not attached thereto because its contents are inconsistent with, and defeat, the assertions made in that affidavit.

[7]    The power to pledge assets was that of Prime One and not of any individual member of Prime One. See §1.9(h) of the Agreement of Prime One Capital Company, LLC (Exhibit "A").  No records documenting any loans or resolutions authorizing the pledge or encumbrance of any assets of Prime One has been produced in opposition to Defendant's Motion to Dismiss or alternatively for Summary Judgment.

**LAW OFFICES OF BRUCE DAVID GREEN, P.A.**
600 South Andrews Avenue, Suite 400, Fort Lauderdale, FL 33301 ☎ (954) 522-8554 ☎ Fax (954) 522-8555

In the absence of any valid assignment of a lease to T&W, T&W could not make any assignment to a creditor (such as the Plaintiff's herein) because T&W could not assign that which it did not own or otherwise have the right to assign.

5. Despite Plaintiff's claims, it is clear that an unspecified employee of T&W had no authority to pledge or encumber assets of Prime One because only a majority of the individuals specified in Section 7.1(c) of Exhibit "A" would have such authority. No instrument assigning any interest in any motor vehicle or lease was ever executed by any individual or combination of individuals authorized to act for or on behalf of Prime One and no such document has been provided to the Court in opposition to the Defendant's Motion to Dismiss or alternatively for Summary Judgment. The failure of the Plaintiff's to produce documentation demonstrating (i) ownership of motor vehicles, (ii) assignment or motor vehicle leases and (iii) a perfected security interest in motor vehicles or leases is fatal to each of their claims.[8]

6. Plaintiff's simply do not have an ownership interest in any motor vehicles and no such claimed interest is recognizable as a matter of law and may not, therefore, form the basis of actionable claims.[9]

_____

[8]    In opposition to a motion for summary judgment, the non-moving party must produce affirmative evidence on matters on which it has the burden of proof at trial sufficient to create a "genuine" issue of fact for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 1356 (1986). The evidence produced by the non-moving party must be significantly probative to permit a reasonable trier of fact to find in favor of the opposing party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 2512 (1986).

[9]    At footnote 5 of the Plaintiff's Supplemental Memorandum of Law the Plaintiff's contend that the Defendant's have misread Florida's Titling Statute. Plaintiff's have (i) not explained how the Defendant's have misread the very plain language of the Titling Statute and (ii) claim that most of the vehicles were not titled in Florida anyway. The Plaintiff's claim that most of the vehicles were not titled in Florida lends no velocity to Plaintiff's claimed interest in any motor vehicle because absent a title transfer there is no recognizable interest. See: Wicox v. U.S., 888 F.2d

7.  Nor have the Plaintiff's produced documentation to support their claim of a perfected secured interest in any of the motor vehicles or motor vehicle leases.[10]  The failure to produce such documentation is fatal to each of the Plaintiff's claims[11] and the Plaintiff's are merely unsecured creditors of T&W having no perfected security interest in the motor vehicles or the motor vehicle leases and thus no right of possession or other interest.  Accordingly, Plaintiff's are not entitled to relief on any of the claims asserted against these Defendant's because they simply have no right to income derived from the motor vehicles or the leases thereof, no right to possession of the motor vehicles and certainly no right to claim interference with the leases in which Plaintiff's have no valid assignment and no documented interest.

8.  Plaintiff's have no cognizable or maintainable claims against these Defendant's.

---

11 1 1 (6th Cir. 1989); Herbert v. Harl, 757 S.W.2d 585 (Mo. 1988); Boren v. State Farm Mutual Auto Ins. Co., 406 N.W.2d 640 (Neb. 1987); In Re: Weaver, 131 B.R. 804 (S.D. Ohio 1991); Warren v. Farmers Ins. Co. of Oregon, 806 P.2d 710 (Or. App. 1991); Morey v. Page, 802 S.W.2d 779 (Tex. App. 1990).

    10    The exhibits annexed to the Complaint may create a contractual claim between the Plaintiff's and T&W, but to not create a perfected security interest between the Plaintiff's and a third party, including these Defendant's.

    11    In Re: Huyck, 167 B.R. 908 (D.S.D. 1994); Stoumbos v. Kilimnik, 988 F.2d 949 (9th Cir. 1993); Orix Credit Alliance, Inc. v. Heard Family Trucking, Inc., 177 B.R. 68 (S.D. Miss. 1994); Pileckas v. Marcucio, 156 B.R. 721 (N.D.N.Y. 1993); In Re: Loken, 175 B.R. 56 (9th Cir. BAP 1994); In Re: Daulton, 155 B.R. 7 (E.D. Ky. 1993); In Re: Beaudoin, 160 B.R. 25 (N.D.N.Y. 1993); In Re: Lease-Sea, Inc., 140 B.R. 185 (N.D. Ohio 1992); In Re: Brace; 163 B.R. 274 (W.D. Pa. 1994); Jones v. Beavers, 866 P.2d 362 (N.M. App. 1993); Hill v. McGee, 562 So.2d 238 (Ala. 1990); First National Bank of Arizona v. Carbajal, 645 P.2d 778 (Ariz. 1982); Union Nat. Bank of Little rock v. Hooper, 746 S.W.2d 550 (Ark 1988); Smith v. City of Miami Beach, 440 So.2d 611 (Fla. 3d DCA 1983);United Carolina Bank v. Capital Auto Co., Inc., 294 S.E.2d 661 (Ga. App. 1982); Mid American Credit Union v. Board of County Commissioners of Sedgwick County, 806 P.2d 479 (Kan.App. 1991); City of Boston v. Rockland Trust Co., 460 N.E.2d 1269 (Mass. 1984); Commercial Tp. v. Block 136, etc., 431 A.2d 862 (N.J Sup. Ch. 1981); Bank of Alamance v. Isley, 328 S.E.2d 867 (N.C. App. 1985); Liberty National Bank & Trust Co. v Oklahoma City v. Garcia, 686 P.2d 303 (Ok. App. 1984); Sherwood v. Bellevue Dodge, Inc., 669 P.2d 1258 (Wash. App. 1983).

**LAW OFFICES OF BRUCE DAVID GREEN, P.A.**
600 South Andrews Avenue, Suite 400, Fort Lauderdale, Fl. 33301 ☎ (954) 522-8554 ☎ Fax (954) 522-8555

## Absence of a Cause of Action; Propriety of Summary Judgment

**9. Counts I & II.** The absence of any documented ownership or security interest in the motor vehicles and the leases defeats Plaintiff's conversion claims in Counts I and II of the Complaint. Aside from the legal infirmity of Count's I [12] and II [13] of the Complaint, the facts elicited by Plaintiff's and presented to the Court in the Appendix to the Supplemental Memorandum of Law defeat these claims.

**10.** The record (as furnished to the Court by the Plaintiff's) shows that the Defendant's did not obtain money or motor vehicles in which the Plaintiff's claim an interest. [14]

**11.** Plaintiff's do not have any basis for relief under Count's I and II both as a matter of law and as a matter of fact. The Court should dismiss Counts I and II, or alternatively enter summary judgment in favor of the Defendant's and against the Plaintiff's on Count's I and II.

**12. Count III.** Plaintiff's concede that Paul B. Luke was a senior management

---

[12] Broadcasting System of Florida, Inc. v. Alfonso, 689 So.2d 1092 (Fla. 3d DCA 1997) [debt which may be discharged by the payment of money in general cannot form the basis of a claim for conversion]; Estate of Bain v. Morales, 606 So.2d 1277 (Fla. 3d DCA 1992) [a sum of money which is specific and segregated in a trust account may be the subject of a claim of conversion]; Rupp v. Schon, 608 So.2d 934 (Fla. 4th DCA 1992) [an action for the conversion of money can only be maintained where the money at issue has been kept seperate].

[13] "Except as otherwise provided herein, no court shall recognize the right, title, claim, or interest of any person in or to any motor vehicle or mobile home sold, disposed of, mortgaged, or encumbered, unless evidenced by a certificate of title duly issued to that person, in accordance with the provisions of this chapter." §319.22(1), Fla. Stats.

[14] See: Deposition of Martin DeVos (Appendix 6 attached to Plaintiff's Supplemental Memorandum of Law), Pp. 118, 132; Deposition of Cindy Petersen (Appendix 7 attached to Plaintiff's Supplemental Memorandum of Law), Pp. 109 & 110; Deposition of Robert L. Petersen (Appendix 8 attached to Plaintiff's Supplemental Memorandum of Law), Pp. 52 - 55; Deposition of David S. Rosen (Appendix 9 attached to Plaintiff's Supplemental Memorandum of Law), Pp. 145, 158 & 159. Plaintiff's claim that Defendant's established a reserve account (See: P.9 of Plaintiff's Supplemental Memorandum of Law) does not show that any money in that account is or was money to which these Plaintiff's had any interest, or that any money was segregated or capable of specific identification to these Plaintiff's to render it subject to a claim of conversion.

**LAW OFFICES OF BRUCE DAVID GREEN, P.A.**
600 South Andrews Avenue, Suite 400, Fort Lauderdale, FL 33301 ☎ (954) 522-8554 ☎ Fax (954) 522-8555

officer of T&W,[15] and therefore that the powers of attorney (which T&W belatedly attempted to revoke) remain valid and in force because, as Defendant's have previously noted, the powers of attorney are coupled with an interest (the net lease income stream) and are, therefore, not subject to revocation. Peacock v. American Agronomics Corporation, 422 So.2d 55 (Fla. 2nd DCA 1982).[16]

13.   The record (as furnished to the Court by the Plaintiff's) shows that the Defendant's did not engage in any conduct which could be classified as interference in any event even assuming that there is or was a tenable claim of contractual interference.[17]

14. Plaintiff's claim that the Defendant's interfered with Finova, their new servicing agent (See P. 6 of Plaintiff's Supplemental Memorandum of Law).  The evidence, however, shows that Finova was inept in the performance of its duties[18] and ineptitude by Finova is not tantamount to interference by Defendants.

15. Plaintiff's also claim that Defendant's advised lessees that they could discharge their lease obligations by delivering the leased vehicles to Defendants, but the evidence shows only

---

[15]   See numbered paragraph 2 of the Affidavit of Thomas W. Price (Appendix 1 attached to Plaintiff's Supplemental Memorandum of Law).

[16]   Plaintiff's do not appear to challenge the claim of the Defendant's that the powers of attorney are coupled with an interest.

[17]   See: Deposition of Martin DeVos (Appendix 6 attached to Plaintiff's Supplemental Memorandum of Law), Pp. 122 - 124, 129 - 130, 132; Deposition of Cindy Petersen (Appendix 7 attached to Plaintiff's Supplemental Memorandum of Law), Pp. 91; Deposition of Robert L. Petersen (Appendix 8 attached to Plaintiff's Supplemental Memorandum of Law), Pp. 77 & 78; Deposition of David S. Rosen (Appendix 9 attached to Plaintiff's Supplemental Memorandum of Law), Pp. 92 - 93, 156.

[18]   See: Deposition of Cindy Petersen (Appendix 7 attached to Plaintiff's Supplemental Memorandum of Law), Pp. 22 & 23, 99; Deposition of Robert L. Petersen (Appendix 8 attached to Plaintiff's Supplemental Memorandum of Law), Pp. 46 - 53; Deposition of David S. Rosen (Appendix 9 attached to Plaintiff's Supplemental Memorandum of Law), Pp. 113 - 114, 119, 123, 133 - 134.

LAW OFFICES OF BRUCE DAVID GREEN, P.A.
600 South Andrews Avenue, Suite 400, Fort Lauderdale, FL 33301 ☎ (954) 522-8554 ☎ Fax (954) 522-8555

that the corporate Defendant's reiterated the basic understanding between the lessor and lessee.[19] That is not interference as Defendant's have both the legal and moral obligation to be truthful and candid, and, as noted above, no vehicles were delivered to Defendant's (see footnote 12).

16. Plaintiff's do not have any basis for relief under Count III as a matter of law and as a matter of fact. The Court should dismiss Count III, or alternatively enter summary judgment in favor of the Defendant's and against the Plaintiff's on Count III.

17. **Count IV.** Count IV is about money and only money. Plaintiff's have not demonstrated a clear legal right to relief, nor that there is a present need for prospective injunctive relief, nor can they, since they have no assignments of any leases or motor vehicle titles and there is no present conduct of Defendant's which could form the basis for injunctive relief.

18. Count IV should be dismissed or the Court should enter summary judgment.

### The Claims Against Borzilleri

19. There is simply no basis upon which **Borzilleri** could have liability to Plaintiff's. The acts of **Borzilleri** (even if committed) were authorized (by virtue of the powers of attorney) and cannot form the basis of a claim for relief. There is no viable action against **Borzilleri** and all claims against **Borzilleri** should be dismissed or the Court should enter summary judgment.

### Alternative Motion for Summary Judgment

20. Plaintiff's have failed to produce affirmative evidence on matters on which

---

[19]   Deposition of Martin DeVos (Appendix 6 attached to Plaintiff's Supplemental Memorandum of Law), Pp. 119 - 120; Deposition of Robert L. Petersen (Appendix 8 attached to Plaintiff's Supplemental Memorandum of Law), Pp. 27, 34; Deposition of David S. Rosen (Appendix 9 attached to Plaintiff's Supplemental Memorandum of Law), Pp. 99 - 103.

**LAW OFFICES OF BRUCE DAVID GREEN, P.A.**
600 South Andrews Avenue, Suite 400, Fort Lauderdale, FL 33301 ☎ (954) 522-8554 ☎ Fax (954) 522-8555

Plaintiff's have the burden of proof sufficient to create a "genuine" issue of fact for trial. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 106 S. Ct. 1348, 1356 (1986).

## CONCLUSION

21. The Court should dismiss the Complaint for failure to state a claim upon which relief can be granted or alternatively enter summary judgment against Plaintiff's.

**BRUCE DAVID GREEN, P.A.**
Counsel for Defendant's
600 South Andrews Avenue
Suite 400
Ft. Lauderdale, FL  33301
Phone: (954) 522-8554

By: _____
    Bruce David Green, Esq.
    Fla. Bar No. 262048

**TEW CARDENAS REBAK KELLOGG, LEHMAN DeMARIA & TAGUE, L.L.P.**
Co-Counsel for Defendant
201 S. Biscayne Boulevard, Suite 2600
Miami, Florida 33131
Phone: (305) 536-1112

LAW OFFICES OF BRUCE DAVID GREEN, P.A.
600 South Andrews Avenue, Suite 400, Fort Lauderdale, FL 33301 ☎ (954) 522-8554 ☎ Fax (954) 522-8555

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the above and foregoing was served upon **C. Ryan Reetz, Esq.**, GREENBERG TRAURIG, P.A., Counsel for Plaintiff's, 1221 Brickell Avenue, Miami, Florida 33131, and **David G. Graham, Esq., Holly A. Harrison, Esq.**, and **Joel M. Hammerman, Esq.**, SIDLEY & AUSTIN, Bank One Plaza, 10 South Dearborn, Chicago, Illinois 60603, by mail, this _28_ day of August, 2000.

By: _____
Bruce David Green, Esq.

**10**

## AGREEMENT OF

## PRIME ONE CAPITAL COMPANY, L.L.C.

THIS AGREEMENT OF LIMITED LIABILITY COMPANY (the "Agreement") is made and entered into as of July 10, 1998, by and between T&W FINANCIAL SERVICES COMPANY L.L.C., a Washington limited liability company ("T&W"), THOMAS BORZILLERI ("Borzilleri") and JOSEPH DAVID PACIFICO ("Pacifico"). The undersigned desire to form and operate a limited liability company under the laws of the State of Washington on the terms and conditions set forth below.

## RECITALS

WHEREAS, Borzilleri and Pacifico have business contacts that are engaged in the commercial auto rental industry throughout the United States and Canada;

WHEREAS, T&W is in the business of financing the purchase or lease of various types of vehicles and related equipment (the "Financing") and has in place the equipment, systems, procedures, banking relationships and personnel necessary for the granting, processing and securing the Financing; and

WHEREAS, Borzilleri, Pacifico and T&W desire to form and operate a limited liability company under the laws of the State of Washington on the terms and conditions set forth below.

The parties hereto agree as follows:

1.      **FORMATION**.

        1.1     **Name and Office**.  The Members hereby form and agree to operate the Company to be known as "Prime One Capital Company, L.L.C." in accordance with the Washington Limited Liability Company Act (the "Act") under the terms and conditions set forth herein.  Except as otherwise provided herein, the rights and liabilities of the Members shall be governed by the Act.

The Company's initial principal place of business is:

6416 Pacific Highway East
Tacoma, Washington 98424

The registered agent and registered office shall be as stated in the Company's Certificate of Formation.  The Members will take such steps as are required in order to register for a certificate of authority in those jurisdictions in which the Company chooses to do business.

        1.2     **Purpose**.  The primary purposes of the Company are:

                (a) to engage in the business of specialized commercial finance and

G:\JVP\Pacifico\LLCAgr

-1-

EXHIBIT _____ A

equipment leasing using products, programs, services and other know-how of T&W and its employees; and

(b) to conduct any other business activities as may be determined by the Members in accordance with this Agreement. The Company shall have the power to do all lawful things necessary, incidental or convenient to accomplish the foregoing purposes.

1.3    **Term**. The Company was formed when the Certificate of Formation was filed with the Office of the Secretary of State of Washington. The term of the Company shall continue until December 31, 2028, unless sooner dissolved, wound up and terminated in accordance with the provisions of this Agreement and the Act.

1.4    **Company Credit and Property**. The Company's credit and Property shall be used solely for the benefit of the Company, and no Property of the Company shall be transferred or encumbered for or in payment of any individual obligation of any Member unless otherwise provided herein.

1.5    **Legal Effect**. Except as otherwise provided herein, the rights and liabilities of the Members shall be governed by the Act. A failure to observe any formalities or requirements of this Agreement, the certificate of formation for the Company or the Act shall not be grounds for imposing personal liability on the Members or the Members of the Governing Board for liabilities of the Company.

1.6    **Partnership Intended for Tax Purposes Only**. The Members have formed the Company under the Act and expressly do not intend for the Company to be a general partnership, limited partnership or a corporation. The Company is to be treated as a partnership solely for federal income tax purposes.

1.7    **Rights of Creditors and Third Parties**. This Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members and their successors and assigns. The Agreement is expressly not intended for the benefit of any creditor of the Company. Except and only to the extent provided by applicable statute, no such creditor shall have any rights under the Agreement or any agreement between the Company and any Member with respect to any contribution or otherwise.

1.8    **Title to Property**. All Company Property shall be owned by the Company as an entity. No Member shall have any ownership interest in such Company Property in the Member's individual name or right. Except as otherwise provided in this Agreement, the Company shall hold all Company Property in the name of the Company and not in the name or names of any Member or Members. Nothing in this Agreement shall preclude the Company from using the trade name of one of its Members in operating its business if such trade name is properly registered with the appropriate agency or authority. Each Member's Interest in the Company shall be personal property for all purposes.

1.9    **Powers**. Subject to the provisions of this Agreement, in furtherance of its

G:\JVP\Pacifico\LLCAgr

-2-

purposes, the Company shall have the following powers:

> (a)    To conduct and operate the business of the Company and to execute documents and instruments relating to the Company business, including, but not limited to, notes, mortgages, deeds of trust, leases, management agreements, contracts and other documents.

> (b)    To procure and maintain insurance covering the various risks to which the Company or its operations may be subject.

> (c)    To open bank accounts in the name of the Company, designate the authorized signatures therefor and make deposits and withdrawals from Company accounts on the signatures of one or more designated individuals.

> (d)    To pay expenses incurred in performing the business and purposes of the Company.

> (e)    To acquire interests in other entities.

> (f)    To issue additional Units in exchange for other assets.

> (g)    To acquire, sell and exchange any assets consistent with the Company's purposes.

> (h)    To borrow funds from T&W, and to grant any lender(s) of T&W, a security interest in all of the assets of the Company as security for any loans made to T&W in connection with the business of the Company; provided, however, that any funds borrowed from T&W shall be used solely for Company purposes.

> (i)    To enter into an agreement with T&W for the purpose of engaging T&W to service or maintain the Company's leases.

> (j)    To do all things necessary, incidental or convenient to the exercise of the foregoing powers and to the accomplishment of the Company's purposes.

2.    **DEFINITIONS.**

The following terms used in the Agreement, whether or not capitalized, shall have the meanings specified below:

> 2.1    **"Act"** means the Washington Limited Liability Company Act, as amended from time to time.

> 2.2    **"Affiliate"** of any Person means (a) any Person controlling, controlled by or under common control with such Person, (b) any Person owning or controlling 5% or more of the outstanding voting interests of such Person, (c) any officer, director or general partner of such Person or (d) any Person who is an officer, director, general partner, trustee or holder of 5% or

G:\JVP\Pacifico\LLCAgr

more of the voting interests of any Person described in clauses (a) through (b) of this sentence. For the purposes of this definition, the term "controls," "is controlled by," or "is under common control with" shall mean possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

2.3    **"Agreement"** means this Limited Liability Company Agreement of <1> L.L.C. as it may be amended from time to time.

2.4    **"Adjusted Capital Account Deficit"** means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(1)  decrease such deficit by any amounts that such Member is obligated to restore pursuant to this Agreement or by operation of law upon liquidation of such Member's Membership Interest or is deemed to be obligated to restore pursuant to the penultimate sentence of each of Treasury Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5); and

(2)  increase such deficit by the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of "Adjusted Capital Account Deficit" is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

2.5    **"Asset Value"** means, for any asset of the Company, such asset's adjusted basis for federal income tax purposes, except as follows:

(a)  The initial Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as agreed upon by the Members and set forth on Exhibit A;

(b)  The Asset Value of all Company assets immediately prior to the occurrence of any event described in clause (i), clause (ii), clause (iii), clause(iv) or clause (v) hereof shall be adjusted to equal their respective gross fair market values, as determined by the Members using such reasonable method of valuation as it may adopt, as of the following times:

(i)  the acquisition of an additional interest in the Company (other than in connection with the execution of this Agreement) by a new or existing Member in exchange for more than a *de minimis* Capital Contribution, if the Members reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(ii)  the distribution by the Company to a Member of more than a

NOV-24-99 WED 11:12 AM   SIGNATURE                FAX NO. 954 345 2092              P. 06

*de minimis* amount of Company property as consideration for an interest in the Company, if the Members reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interest of the Members in the Company;

(iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and

(iv) at such other times as the Members shall reasonably determine to be necessary or advisable in order to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2.

(c) The Asset Value of any Company asset distributed to a Member shall be the gross fair market value of such asset on the date of distribution as reasonably determined by the Members.

(d) If the Asset Value of a Company asset has been determined or adjusted pursuant to subsection (a) or subsection (b) above, such Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Income and Net Losses.

2.6    **"Bankruptcy"** means, with respect to any Person:

(a)    the commencement of any proceeding against a Person seeking reorganization, arrangements, composition, readjustment, liquidation, dissolution, or similar relief under any federal or state bankruptcy or insolvency law or other similar law which proceeding is not dismissed within 60 days, or the appointment without the Person's consent of a trustee, receiver or liquidator of such Person of all or a substantial part of the Person's property, which appointment is not vacated within 60 days after it is made;

(b)    the filing by such Person of a petition or answer or consent seeking relief under any federal or state bankruptcy or insolvency law or other similar law, or the seeking or consent of such Person to the institution of proceedings thereunder or to the filing of any such petition or to the appointment or taking possession of a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of such Person or of any substantial part of its property or the filing of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it or described in this clause;

(c)    the making by such Person of a general assignment for the benefit of creditors; or

(d)    the taking of corporate or partnership action by such Person in furtherance of any of the foregoing actions.

NOV-24-99 WED 11:12 AM   SIGNATURE                    FAX NO. 954 345 2092              P. 07

2.7     **"Capital Account"** means the account maintained for each Member in accordance with Section 4. In the case of a transfer or assignment of an Interest allowed under this Agreement, the person or entity acquiring an Interest, i.e., the Assignee or Member as the case may be, shall succeed to the Capital Account of the transferor or, in the case of a partial transfer, a proportionate share thereof.

2.8     **"Capital Contribution"** means the total amount of money and the fair market value of all property contributed to the Company by each Member pursuant to the terms of the Agreement as a capital contribution. Capital Contribution shall also include any amounts paid directly by a Member to any creditor of the Company in respect of any guarantee or similar obligation undertaken by such Member in connection with the Company's operations. Any reference to the capital contribution of a Member shall include the capital contribution made by a predecessor holder of the interest of such Member.

2.9     **"Cash Available for Distribution"** means all cash receipts (including sale and refinancing proceeds, but excluding proceeds available upon the dissolution of the Company) of the Company in excess of amounts reasonably required for payment of operating expenses, repayment of current liabilities and the establishment of and additions to the cash reserves established by the Members for the operation of the business, including, but not limited to, reserves for contingent liabilities or obligations of the Company.

2.10    **"Code"** means the United States Internal Revenue Code of 1986, as amended from time to time. References to specific Code sections or Treasury Regulations shall be deemed to refer to such Code sections or Treasury Regulations as they may be amended from time to time or to any successor Code sections or Treasury Regulations if the Code section or Treasury Regulation referred to is repealed.

2.11    **"Company"** means Prime One Capital Company, L.L.C. created and governed by this Agreement.

2.12    **"Company Property"** or **"Property"** means all the real and personal (tangible and intangible) property owned by the Company.

2.13    **"Deemed Capital Account"** means a Member's Capital Account, as calculated from time to time, adjusted by (a) adding thereto the sum of each Member's share of Minimum Gain (determined after any decreases therein for such year), if any, and such Member's Mandatory Obligation, if any, and (b) subtracting therefrom (1) allocations of losses and deductions that are reasonably expected to be made as of the end of the taxable year to the Members pursuant to Code Section 704(e)(2), Code Section 706(d) and Treasury Regulation Section 1.751-1(b)(2)(ii) and (2) distributions which at the end of the taxable year are reasonably expected to be made to the Member to the extent that said distributions exceed offsetting increases to the Member's Capital Account (including allocations of the Qualified Income Offset pursuant to Section 6.3, but excluding allocations of Minimum Gain Chargeback pursuant to Section 6.3) that are reasonably expected to occur during (or prior to) the taxable years in which such distributions are reasonably expected to be made.

2.14    **"Depreciation"** means, for each year or other applicable period, an

G:\JVP\Pacifico\LLCAgr

amount equal to the federal income tax depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or period, Depreciation shall be in an amount that bears the same ratio to such beginning Asset Value as the federal income tax deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization or other cost recovery deduction for such year or period is zero, Depreciation shall be determined with reference to such beginning Asset Value using any reasonable method selected by the Members.

2.15    **"Interest"** or **"Member Interest"** means the Units of a Member, including the right of such Member to any and all benefits to which such Member may be entitled as provided in the Agreement and in the Act, together with the obligations of such Member to comply with all the terms and provisions of the Agreement and the Act.

2.16    **"Mandatory Obligation"** means the sum of (i) the amount of a Member's remaining contribution obligation, if any, (including the amount of any Capital Account deficit such Member is obligated to restore upon the liquidation of the Company, if any) provided that such contribution must be made in all events within ninety (90) days of liquidation of the Member's interest as determined under Treasury Regulation Section 1.704-1(b)(2)(ii)(g), and (ii) the additional amount, if any, such Member would be obligated to contribute as of year end to retire indebtedness of the Company if the Company were to liquidate as of such date and dispose of all of its assets at book value.

2.17    **"Member(s)"** means those persons who own an Interest in the Company and execute this Agreement or a counterpart of this Agreement.  Except as otherwise provided in this Agreement, a Member shall not be entitled to vote or otherwise participate in any decision with respect to the Company.

2.18    **"Minimum Gain"** means the amount determined by computing, with respect to each nonrecourse liability of the Company, the amount of gain, if any, that would be realized by the Company if it disposed of the Company Property subject to such nonrecourse liability in full satisfaction thereof in a taxable transaction, and then by aggregating the amounts so determined.  Such gain shall be determined in accordance with Treasury Regulation Section 1.704-2(d).  Each Member's share of Minimum Gain at the end of any taxable year of the Company shall be determined in accordance with Treasury Regulation Section 1.704-2(g)(l).  Notwithstanding the foregoing, in the event the Company incurs "partner nonrecourse debt," appropriate adjustments shall be made to conform to the requirements of the Treasury Regulations governing partner nonrecourse debt.

2.19    **"Notice"** means a writing, containing the information required by this Agreement to be communicated to any Person, and given in accordance with Section 14.1.

2.20    **"Percentage Interest"** for each Member means the ratio that the Units held by each Member bears to the number of Units held by all Members.

2.21    **"Person"** means any individual, partnership, limited liability company,

G:\JVP\Pacifico\LLCAgr

-7-

corporation, trust or other entity.

   2.22 **"Profits" or "Losses"** means, for each fiscal year, an amount equal to the Company's taxable income or taxable loss under Section 703(a) of the Code (including all items of income, gain, loss or deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

     (a)  Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits (or Losses) pursuant to this definition of "Profits" or "Losses" shall be added to (or subtracted from, as the case may be) such taxable income (or loss);

     (b)  Any expenditure of the Company described in Code Section 705(a)(2)(B) or treated as a Code Section 705(a)(2)(B) expenditure pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits (or Losses) pursuant to this definition of "Profits" or "Losses," shall be subtracted from (or added to, as the case may be) such taxable income (or loss);

     (c)  In the event the Asset Value of any Company asset is adjusted pursuant to subsection (b) or subsection (c) of the definition of "Asset Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such assets for purposes of computing Profits or Losses;

     (d)  Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized from federal income tax purposes shall be computed by reference to the Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Asset Value;

     (e)  In lieu of the depreciation, amortization and other cost recovery deductions that would otherwise be taken into account in computing such taxable income or loss, there shall be taken into account Depreciation from such Company year;

     (f)  To the extent that an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

     (g)  Notwithstanding any other provision of this definition of "Profits" or "Losses," any item that is specifically allocated pursuant to Section 6.2 or Section 6.3 hereof shall not be taken into account in computing Profits and Losses. The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 6.2 or Section 6.3 hereof shall be determined by applying rules analogous to those set forth in the definition of "Profits" or "Losses."

2.23    **"Reserves"** means, with respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the Members for the "credit enhancement loss reserve" and other items such as working capital, and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

2.24    **"Units"** means ownership interest in the Company as expressed as a number of Units in the Company, as provided in Section 3.1 below. Each Unit owned by a Member shall carry one vote. Units owned by an assignee shall not entitle the owner to vote or otherwise entitle the owner to any right or benefit of a Member except the right to distributions as provided under this Agreement unless the Assignee is admitted as a Member pursuant to Section 9.3.

2.25    **"Outside Party"** means any person or entity other than a Member.

2.26    **"Permanent Disability"** means the inability of Pacifico or Borzilleri to perform his duties hereunder by reason of injury or illness incapacitating him for a continuous period exceeding one hundred eighty (180) days.

3.    **UNITS AND LOANS.**

3.1    **Units.** Each Member shall have the specified number of Units and Percentage Interest in the Company as set forth below:

| Member | Units | Percentage Int. |
|--------|-------|-----------------|
| T&W | 510 | 51.0% |
| Borzilleri | 245 | 24.5% |
| Pacifico | 245 | 24.5% |
| Total: | 1,000 | 100.0% |

3.2    **Additional Capital Contributions.** From time to time, the Members may make additional capital contributions to the Company if approved by the Governing Board. If such contributions are made, the Company shall issue additional Units to the contributing Member in exchange therefor and each Member's Percentage Interest in the Company shall be adjusted accordingly. Except as provided in Section 5.2, unless mutually agreed by the Members, no Member shall be required to make any additional Capital Contributions to the Company.

3.3    **Member Loans.** The Members may elect to loan funds to the Company for Company purposes. Such Member loans shall be made on commercially reasonable terms and conditions as determined by the Governing Board.

3.4    **No Interest on Capital.** No Member shall be entitled to receive interest

G:\JVP\Pacifico\LLCAgr

on its capital contributions or its Capital Account.

        3.5    **No Withdrawal of Capital**.  Except as otherwise provided in this Agreement, no Member shall have the right to withdraw or demand a return of any or all of its capital.  It is the intent of the Members that no distribution (or any part of any distribution) made to any Member pursuant to Section 5 hereof shall be deemed a return or withdrawal of capital, even if such distribution represents (in full or in part) a distribution of revenue offset by depreciation or any other non-cash item accounted for as an expense, loss or deduction from, or offset to, the Company's income, and, except as provided in this Agreement, no Member shall be obligated to pay any such amount to or for the account of the Company or any creditor of the Company.

## 4.    CAPITAL ACCOUNTS.

        4.1    **Establishment of Capital Accounts**.  The Company shall establish and maintain a Capital Account for each Member in accordance with Treasury Regulations issued under Code Section 704. The Capital Account of each Member shall be **increased** to reflect (i) such Member's cash contributions, (ii) the fair market value of property contributed by such Member (net of liabilities securing such contributed property that the Company is considered to assume or take subject to under Code Section 752) and (iii) such Member's share of Profits (including all gain as calculated pursuant to Section 1001 of the Code) of the Company.  The Capital Account of each Member shall be **reduced** to reflect (a) the amount of money and the fair market value of property distributed to such Member (net of liabilities securing such distributed property that the Member is considered to assume or take subject to under Section 752), (b) such Member's share of non-capitalized expenditures not deductible by the Company in computing its taxable income as determined under Code Section 705(a)(2)(B), (c) such Member's share of Losses of the Company and any deduction specially allocated pursuant to Section 6.2 or Section 6.3 and (d) such Member's share of amounts paid or incurred to organize the Company to the extent that an election under Code Section 709(b) has not properly been made for such amounts.  The Members shall determine mutually the fair market value of all property which is distributed in kind, and the Capital Accounts of the Members shall be adjusted as though the property had been sold for its fair market value and the gain or loss attributable to such sale allocated among the Members in accordance with Section 6.  In the event of a contribution of property with a fair market value which is not equal to its adjusted basis (as determined for federal income tax purposes) or a reevaluation of the Members' Capital Accounts upon the admission of new Members to the Company, the Company shall maintain separate Capital Accounts and "tax" capital accounts in accordance with the rules prescribed in Treasury Regulations promulgated under Code Section 704.

4.2     **Adjustment to Capital Accounts**.

(a)     If the Asset Values of the Company's assets are adjusted pursuant to Section 2.5(b), then the Capital Accounts of all Members shall also be adjusted as though (i) there were a taxable disposition of the Company's assets for their fair market value on the date of such adjustment, (ii) the resulting income, gain, loss or deduction was allocated between the Members (to the extent that such income, gain, loss or deduction has not previously been reflected in the Capital Accounts of the Members) and (iii) the Members' distributive shares of depreciation, amortization and gain or loss with respect to such asset were determined so as to take into account the variation between the adjusted tax basis and the fair market value of such assets in the same manner as such variation is taken into account under Section 704(c) of the Code.

(b)     If the Company distributes an asset to a Member in kind, and the fair market value of such asset differs from its adjusted basis for federal income tax purposes, the Capital Accounts of both Members shall be adjusted as though the Company had sold such asset for its fair market value on the date of such distribution and the resulting income, gain, loss or deduction had been allocated to the Members to the extent that such income, gain, loss or deduction had not previously been reflected in the Members' Capital Accounts.

(c)     If the Asset Value of an item of Company Property differs from its adjusted basis for federal income tax purposes, and Section 704(c) of the Code applies to such Company Property, the Capital Accounts of the Members will be adjusted for allocations of depreciation or amortization computed in accordance with Section 2.23(d) and allocations of gain or loss computed in accordance with Section 2.23(d) in the manner set forth in Treasury Regulation Section 1.704-1(b)(2)(iv)(g).

5.     **Distribution of Cash Available for Distribution**.

5.1     **General**.  At such times as the Governing Board shall determine, Cash Available for Distribution resulting from operations may be distributed to the Members in proportion to their Percentage Interests.

5.2     **Reserve for Bad Debts**.  The Company shall establish a  reserve (the "Reserve") for the uncollectability of lease/finance arrangements entered into by the Company ("Leases") by charging to the Company's expenses at the time a lease is entered into an amount equal to 1% times the sum of the aggregate net investment under such Lease and such expenses shall be allocated to the Members in accordance with their respective Percentage Interest.  As losses are incurred with respect to Leases, they shall be charged to the Reserve, until the Reserve is reduced to zero.  At the end of each year, the Governing Board shall determine the amount held in the Reserve.  If the amount in the Reserve exceeds 1% of the aggregate obligations owing under all Leases, then the Company shall pay the excess to the Members in proportion to their Percentage Interests within thirty (30) business days.  If the amount in the Reserve is less than 1% of the aggregate obligations owing under all Leases, then such amount as is required in order for the Reserve amount to equal at  least 1% times the sum of the aggregate obligations under the Leases, shall be charged against each Member's

allocation of profit in proportion to his or its percentage interest.

   **5.3 Tax Distributions**.  Notwithstanding the provisions of Section 5.1, on or before the end of the third month following each calendar year, the Company shall make cash distributions to each Member equal to the excess of the taxable income allocated to such Member for such preceding calendar year over the amount of cash distributions made to such Member during such preceding calendar year (not including cash distributed pursuant to this Section 5.3), multiplied by the highest individual marginal federal income tax rate in effect for such preceding calendar year.

### 6. Allocations.

   **6.1 Allocation of Profits and Losses**.  Except as otherwise provided in this Section 6 and in Section 11.4, Profits and Losses of the Company shall be allocated among the Members in accordance with their respective Percentage Interests. Until such time as the Company's Net Equity equals or exceeds U.S. $5,000,000, Profits and Losses of the Company shall be allocated as follows:  60% to T&W, 20% to Borzilleri and 20% to Pacifico.  At such time that the Company's Net Equity equals or exceeds U.S. $5,000,000, the allocation of Profits and Losses of the Company shall be and remain as follows:  51% to T&W, 24.5% to Borzilleri and 24.5% to Pacifico.  For purposes of this Section 6.1, the Company's "Net Equity" means the net amount by which the book value of the Company's assets exceeds the Company's liabilities, as determined on or before March 31 of each calendar year by the Company's accountants applying generally accepted accounting principles in the United States.

   **6.2. Recourse Deductions**.  Any item of deduction or loss that is not included as a nonrecourse deduction under Treasury Regulation Sec. 1.704-2(c) shall be allocated among the Members in the manner prescribed by Section 6.1.

   **6.3 Additional Allocation Provisions**.  Notwithstanding the foregoing provisions of this Article 6:

    (a) **Regulatory Allocations**.

     (i) Minimum Gain Chargeback.  Except as otherwise provided in Treasury Regulations Section 1.704-2(f), notwithstanding the provisions of Section 6.2 hereof, or any other provision of this Article 6, if there is a net decrease in Company Minimum Gain during any Company year, each Member shall be specifically allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, as determined under Treasury Regulations Section 1.704-2(g).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 6.3(a)(i) is intended to qualify as a "minimum gain chargeback" within the meaning of Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(ii)  Member Minimum Gain Chargeback.  Except as otherwise provided in Treasury Regulations Section 1.704-2(I)(4) or in Section 6.3(a)(i) hereof, if there is a net decrease in Member Minimum Gain attributable to a Member Nonrecourse Debt during any Company year, each Member who has a share of the Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specifically allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(I)(4) and 1.704-2(j)(2).  This Section 6.3(a)(ii) is intended to qualify as a "chargeback of partner nonrecourse debt minimum gain" within the meaning of Treasury Regulations Section 1.704-2(i) and shall be interpreted consistently therewith.

(iii)     Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any Company year shall be specially allocated to the Member(s) who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable, in accordance with Treasury Regulations Section 1.704-2(i).

(iv)     Qualified Income Offset.  If any Member unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulations Section 1.704-1(b) (2) (ii) (d) (4), (5) or (6), items of Company income and gain shall be allocated in accordance with Treasury Regulations Section 1.704-1(b) (2) (ii) (d), to such Member in an amount and manner sufficient to eliminate, to the extent required by such Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 6.3(a)(iv) shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided in this Article 6 have been tentatively made as if this Section 6.3(a)(iv) were not in the Agreement.  It is intended that this Section 6.3(a)(iv) qualify and be construed as a "qualified income offset" within the meaning of Treasury Regulations Section 1.704-1(b) (2) (ii) (d) and shall be interpreted consistently therewith.

(v)     Gross Income Allocation.  In the event that any Member has a deficit Capital Account at the end of any Company year that is in excess of  such Member's Adjusted Capital Account Deficit, each such Member shall be specially allocated items of Company income and gain in the amount of such excess to eliminate such deficit as quickly as possible, provided that an allocation pursuant to this Section 6.3(a)(v) shall be made if and only to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided in this Article 6 have been tentatively made as if this Section 6.3(a)(v) and Section 6.3(a)(iv) hereof were not in the Agreement.

(vi)     Limitation on Allocation of Net Loss.  To the extent that any

allocation of loss under Section 6.1 or Section 6.2 would cause or increase an Adjusted Capital Account Deficit as to any Member, such allocation of loss shall be reallocated among the other Members in accordance with their respective Percentage Interests, subject to the limitations of this Section 6.3(a)(vi).

(vii)    Section 754 Adjustment.  To the extent that an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b) (2) (iv) (m) (2) or Treasury Regulations Section 1.704-1(b) (2) (iv) (m) (4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in accordance with their Percentage Interests in the event that Treasury Regulations Section 1.704-1(b) (2) (iv) (m) (2) applies, or to the Members to whom such distribution was made in the event that Treasury Regulations Section 1.704-1(b) (2) (iv) (m) (4) applies.

(viii)    Curative Allocations.  The allocations set forth in Sections 6.3(a)(i), (ii), (ii), (iv), (v), (vi) and (vii) hereof (the "Regulatory Allocations") are intended to comply with certain regulatory requirements, including the requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2.  Notwithstanding the provisions of Section 6.1 or hereof, the Regulatory Allocations shall be taken into account in allocating other items of income, gain, loss and deduction among the Member so that to the extent possible without violating the requirements giving rise to the Regulatory Allocations, the net amount of such allocations of other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred.

(c)    Allocation of Excess Nonrecourse Liabilities.  For purposes of determining a Member's proportional share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulations Section 1.752-3(a) (3), each Member's interest in Company profits shall be such Member's Percentage Interest.

(d)    Financial Matters.  If, upon the final dissolution and termination of the Company and after taking into account all allocations under this Agreement, the distributions to be made in accordance with positive Capital Account balances would result in a distribution that would be different from a distribution under Section 5.1 of this Agreement, then notwithstanding any provision to the contrary in this Agreement, gross items of income, gain, loss, deduction and credit under this Agreement for such taxable year (and, to the extent permitted by Section 761(c) of the Code, gross items of income, gain, loss, deduction and credit under this Agreement for the immediately preceding taxable year) shall be allocated to the Members to increase or decrease Capital Account balances, as the case may be, so that the final distribution under this Agreement will occur in the same manner as set forth in Section 5.1 of this Agreement.

6.4    Tax Allocations.

G:\JVP\Pacifico\LLCAgr

(a)    **In General**.  Except as otherwise provided in this Section 6.4, for income tax purposes under the Code and the Treasury Regulations each Company item of income, gain, loss and deduction (collectively, "Tax Items") shall be allocated among the Members in the same manner as its correlative item of "book" income, gain , loss or deduction is allocated pursuant to Sections 6.1, 6.2 and 6.3 hereof.

(b)    **Allocations Respecting Section 704(c) Revaluations**.  Notwithstanding Section 6.4(a) hereof, Tax Items with respect to Property that is contributed to the Company with an Asset Value that varies from its basis in the hands of the contributing Member immediately preceding the date of contribution shall be allocated among the Members for income tax purposes pursuant to Treasury Regulations promulgated under Code Section 704(c) so as to take into account such variation.  The Company shall account for such variation under any method approved under Code Section 704(c) and the applicable Treasury Regulations as chosen by the Members, including, without limitation, the "remedial allocation method" as described in Treasury Regulations Section 1.704-3(d).  In the event that the Asset Value of any Company asset is adjusted pursuant to subsection (b) of the definition of "Asset Value" (provided in Article 2 hereof), subsequent allocations of Tax Items with respect to such asset shall take account of the variation, if any, between the adjusted basis of such asset and its Asset Value in the same manner as under Code Section 704(c) and the applicable Treasury Regulations.

7.     <u>**MANAGEMENT**</u>.

7.1    **Governing Board**.  The business and affairs of the Company shall be managed by a group of three persons ("Governing Board"), of which one shall be Borzilleri, one shall be Pacifico and one shall be a person designated by T&W (a "T&W Designee").  The person to serve as the T&W Designee shall be designated by T&W to the other Members from time to time.  The initial T&W Designee shall be Paul B. Luke.  Until further action of the Governing Board, Paul Luke will be the Chairman of the Governing Board.  Each Member of the Governing Board shall be entitled to one (1) vote.  The Governing Board shall hold an annual meeting on such date and at such time as the members of the Governing Board shall agree.

(a)    Subject to subsections (b) and (c) of this Section 7.1, the Governing Board shall manage the affairs of the Company and shall have the right and authority to take all actions which the Governing Board deems necessary, useful or appropriate for the management and conduct of the Company's business.  The Governing Board may exercise all powers of the Company and do all such lawful things as are not prohibited by the Act or this Agreement directed or required to be exercised or done by the Members.

(b)    The Governing Board may, but shall not be required to, hold meetings.  The meetings of the Governing Board shall be held at such places and times as unanimously agreed on by the members of the Governing Board.  The Governing Board shall take action by not less than a majority vote of its members.  The quorum required for the transaction of business at a meeting of the Governing Board will be a majority of the members of the Governing Board, at least one of which must be the T&W Designee.  The Governing Board may take action

G:\JVP\Pacifico\LLCAgr

-15-

by unanimous written consent in lieu of a meeting. Meetings may be held by, or through the use of, any means of communication by which all members of the Governing Board participating may simultaneously hear each other through the meeting.

(c)     The Governing Board may elect or appoint officers of the Company who shall serve at the pleasure of the Governing Board. The officers of the Company, if deemed necessary by the Governing Board, shall be a chairman, a president, one or more vice-presidents, a secretary and a treasurer. Any individual may hold any number of offices. No officer need be a resident of the State of Washington, or a citizen of the United States, but all officers shall be either a Member (as in the case of Borzilleri or Pacifico) or employees, officers, directors, shareholders, or members of a Member, or an entity that has a controlling ownership interest in a Member. Initially, the following individuals shall serve as officers of the Company in the capacities set forth opposite their names:

| Name | Office |
|------|--------|
| Thomas Borzilleri | C.E.O. |
| Joseph David Pacifico | President |
| Paul B. Luke | C.F.O./C.O.O. |

7.2     **Major Decisions.** Notwithstanding any other provision in this Agreement to the contrary, the following decisions shall require the agreement or consent of not less than a majority of the members of the Governing Board, of which at least one member must be the T&W Designee:

(a)     Any single capital expenditure of the Company of more than $25,000 or any capital expenditures which in any fiscal year are in the aggregate more than $25,000, other than capital expenditures made pursuant to any capital expenditure budget previously approved by the Governing Board;

(b)     To use any Company Property for any purpose other than as set forth in Section 1.2 of this Agreement;

(c)     To reorganize the Company into any other form of legal entity;

(d)     To pay salary or compensation to any Member or its Affiliate, except as expressly provided in this Agreement;

(e)     To authorize the sale of any additional Capital Contributions or other interests in the Company.

(f)     To enter into any contract, agreement or other transaction between the Company and a Member or its Affiliate;

(g)     To effect any change in the authorized signing officers of the

G:\JVP\Pacifico\LLCAgr

Company in respect of legal documents or transactions with a bank or other financial institution;

(h)   To guaranty an obligation of any other Person; or

(i)   To engage in any transaction out of the ordinary course of the Company's business.

7.3   **Company Expenses**.  The Company shall pay, and the Members shall be reimbursed for, all costs and expenses of the Company, which may include, but are not limited to:

(a)   All organizational expenses incurred in the preparation of this Agreement and in the formation of the Company;

(b)   All costs reasonably related to the conduct of the Company's business, including, but without limitation, the cost of supplies, taxes, license fees, and services contracted from third parties;

(c)   All costs of borrowed money, taxes and assessments on Company Property, and other taxes applicable to the Company;

(d)   Fees and expenses paid to accountants, attorneys, auditors, insurance brokers and other agents;

(e)   The cost of insurance obtained in connection with the business of the Company;

(f)   Expenses in connection with the administration and operation of the Company, and communications with the Members;

(g)   Costs incurred in connection with any litigation, including any examinations or audits by regulatory agencies; provided, however, that with regard to litigation between or among Members, each Member shall be responsible for his or its own costs and expenses, including experts, appraisal and attorneys' fees, and such costs and expenses shall not be subject to reimbursement or indemnification by the Company or any Member under any provision of this Agreement.  and

(h)   Other reasonable and necessary expenses related to or desirable to carry out the purposes of the Company.

7.4   **Servicing of Leases**.  T&W shall service the leases on behalf of the Company.  In connection therewith, T&W shall bill the lessees for all amounts owing under the leases (including the regular payment, taxes and insurance).  Each month, T&W shall charge servicing costs to the Company at the rate of .5% per annum on leases held by the Company and being serviced by T&W.  The amount of servicing fee shall be determined monthly by multiplying .5% times the servicing amount payable under all leases held by the Company and being serviced by T&W and dividing the result by twelve.  An example of such calculation is set forth on Exhibit

G:\JVP\Pacifico\LLCAgr

"D" which is attached hereto and incorporated herein. All other direct costs will be charged to the Company. After six months, the Governing Board and T&W shall review the servicing arrangement and the servicing fee charged by T&W shall be either increased or decreased to reflect T&W's actual cost in servicing the Company's leases.

7.5 **Indemnification**. The Company shall indemnify and hold the Members, members of the Governing Board and the officers harmless from any loss or damage, including attorney fees actually and reasonably incurred, by reason of any act or omission performed or omitted by a Member, member of the Governing Board or officer on behalf of the Company or in the furtherance of the Company's interests or as Tax Matters Partner; however, recovery under such indemnification or agreement to hold harmless shall be only out of the assets of the Company and not from the Members, the members of the Governing Board or the officers. The indemnification provided by this Section 7.5 extends to any liability that a Member incurs by reason of any personal guaranty executed by a Member in connection with the securitization of the Company's leases or other financial assets. No indemnification shall be provided to any Person for acts or omissions of the Member finally adjudged to (a) constitute gross negligence, intentional misconduct, a knowing violation of law, or conduct violating RCW 25.15.235, or (b) involve any transaction from which the Member will personally receive a benefit in money, property or services to which the Member is not legally entitled under the Act.

7.6 **Distributions to Pacifico & Borzilleri**. As a distribution against their percentage of Cash Available for Distribution, Pacifico and Borzilleri shall each receive $10,800 bi-monthly to be paid by the Company to them no later than the fifteenth (15th) and thirtieth (30th) of each month.

7.7 **Liability of Members**. Neither the Members nor the members of the Governing Board nor any officer shall be liable, solely by reason of being a Member or a member of the Governing Board or an officer, for any of the debts, losses or obligations of the Company of any kind whatsoever in excess of the amount of cash or value of property contributed or required to be contributed by him to the capital of the Company in accordance with the provisions of Section 3 hereof, including without limitation, any debt, loss or obligation arising under a judgment decree or order of a court, any loans to the Company, any leases of real or personal property, or any obligation or liability of the Company of any kind for the acts or omissions of any other Member, member of the Governing Board, officer, agent or employee of the Company.

## 8. BOOKS AND RECORDS, ACCOUNTING, REPORTS AND STATEMENTS AND TAX MATTERS.

8.1 **Books and Records**. The Governing Board shall, at the expense of the Company, keep and maintain, or cause to be kept and maintained, the books and records of the Company.

8.2 **Annual Accounting Period**. All books and records of the Company shall be kept on the basis of an annual accounting period ending December 31 of each year, except for the final accounting period which shall end on the date of termination of the Company. All references herein to the "fiscal year of the Company" are to the annual accounting period described in the preceding sentence, whether the same shall consist of twelve months or less.

G:\JVP\Pacifico\LLCAgr

-18-

8.3    **Governing Board's Reports to Members**.

      (a) Within ninety (90) days after the end of each fiscal year of the Company, the Governing Board shall send at Company expense to the Members (i) a copy of the Company federal and state income tax returns for such fiscal year, and (ii) such information as shall be necessary for the preparation by the Members of their federal income tax returns which shall include a computation of the distributions to each Member and the allocation to each Member of Profits or Losses, as the case may be.

      (b) The Governing Board shall deliver to the Members on or about sixty (60) days following the end of each calendar quarter an unaudited balance sheet of the Company as of the end of the preceding calendar quarter, an unaudited sources and uses of funds for such quarter, an unaudited statement of the Company's income and expenses for such quarter and for the period since the end of the preceding fiscal year, and other accounting reports which are prepared for the Governing Board, all prepared in accordance with generally accepted accounting principles consistently applied (without footnotes), subject to usual year-end audit adjustments.

8.4    **Right to Examine and/or Audit Records**.  Each Member shall be entitled, upon written request directed to the Company, to review the records of the Company at all reasonable times and at the location where such records are kept by the Company.  In addition, Members holding a majority of the Units may at any time (but not more frequently than annually), by giving the Company at least two weeks written notice, elect to conduct, at their expense, an independent audit of Company financial records.

8.5    **Tax Matters Partner**.

      (a)    Should there be any controversy with the Internal Revenue Service or any other taxing authority involving the Company, the Members may expend such funds as it deems necessary and advisable in the interest of the Company to resolve such controversy satisfactorily, including, without being limited thereto, attorneys' and accounting fees.  T&W FSC is hereby designated as the "Tax Matters Partner" as referred to in Section 6231(a)(7)(A) of the Code, and is specially authorized to exercise all of the rights and powers now or hereafter granted to the Tax Matters Partner under the Code.

      (b)    Any cost incurred in the audit by any governmental authority of the income tax returns of a Member (as opposed to the Company) shall not be a Company expense, except for a case where the source of the audit arises out of or is in connection with an accounting position taken by the Company's accountants.

8.6    **Tax Returns**.  The Governing Board shall, at Company expense, cause the Company to prepare and file a United States Partnership Return of Income and all other tax returns required to be filed by the Company for each fiscal year of the Company.

8.7    **Tax Elections**.  The Governing Board may make one or more elections pursuant to Section 754 of the Code to adjust the basis of the assets of the Company.  Each of

C:\JVP\Pacifico\LLCAgr

the Members will, upon request, supply any information necessary to properly give effect to any such election. The Governing Board, in its sole discretion, shall be authorized to cause the Company to make and revoke any other elections for federal income tax purposes as they deem appropriate, necessary, or advisable.

### 9.  TRANSFERS OF COMPANY INTERESTS.

**9.1  No Transfers**. During a Member's lifetime, except as specifically provided in this Section 9, a Transfer (hereinafter defined) of a Member Interest in the Company may not be effected without the consent of all of the other Members (which consent may be granted or withheld in each Member's sole discretion). Any attempted Transfer by a Person of a Member Interest or right, or any part thereof, in or in respect of the Company other than in accordance with this Section 9 shall be, and is hereby declared, null and void ab initio. For purposes of this Agreement, "Transfer" shall mean the disposing of or parting with all or a portion of an interest (legal or equitable) by any means, direct or indirect, absolute or conditional, voluntary or involuntary including, but not limited to, by sale, assignment, court order, operation of law, equitable or other distribution after divorce or separation, exchange, abandonment, waiver, gift, alienation, bequest, pledge, hypothecation, encumbrance or disposal.

**9.2  Right of First Refusal**. If a Member wishes to sell his or its entire Member Interest ("Selling Member") pursuant to a written offer which he or it has received from a prospective purchaser which contains a selling price, payment terms and the other material terms of the transaction ("Offer"), he or it must first notify the Governing Board and the non-Selling Members in writing ("Notice"), who shall have a right of first refusal to purchase such Member Interest under the following terms and conditions. The Members may request, and the proposed transferee shall provide, financial statements and references as reasonably necessary to demonstrate the ability of the proposed transferee to pay for the Member Interest pursuant to the Offer.

**9.2.1 Exercise**. Upon the receipt of the Notice, the non-Selling Members shall have thirty (30) days to exercise their right of first refusal by notice in writing to the Selling Member, exercising their right to purchase all or a portion of the Selling Member's Member Interest at the price and on the terms as set forth in the Offer.  If more than one of the non-Selling Member's exercises his option hereunder, such non-Selling Members shall purchase the Member Interest of the Selling Member in the proportion that the Member Interests in the Company owned by each non-Selling Member bears to the total Members' Interests owned by all of the non-Selling Members, or in such other proportion as such non-Selling Members may agree.  To the extent that the non-Selling Members fail to exercise this right of first refusal, the Company shall have thirty (30) days to exercise its right of first refusal for the portion of the Selling Member's Member Interest not so purchased by the non-Selling Members by notice in writing to the Selling Member, exercising its right to purchase such Selling Member's Member Interest at the price and on the terms as set forth in the Offer. Notwithstanding the preceding sentences of this subsection 9.2.1, the purchase by the Company and/or the non-Selling Members combined must be for all of the Selling Member's Member Interest.  If the Offer does not contain a closing date, then after providing notice of intent to exercise the right to purchase such Member Interest under this subsection 9.2.1,

G:\JVP\Pacifico\LLCAgr

closing shall take place with forty-five (45) days after providing such notice.

        **9.2.2   Failure to Exercise**. If neither the Company nor the non-Selling Members exercises this right of first refusal so that either the Company and/or the non-Selling Members will purchase the Selling Member's Member Interest in accordance with the Offer, the Selling Member shall be entitled to sell his or its entire Member Interest in accordance with the Offer, provided that such sale shall not take place if, subsequent to the failure of the Company and/or the non-Selling Members to exercise the right of first refusal, as a result of further negotiation of the Offer, the terms and conditions of such offer are materially more favorable than contained in the Offer ("New Offer"). If such is the case, the Company and the non-Selling Members shall have a right of first refusal to such New Offer as set forth in this Section 9.2. If such sale is not completed, such Member Interest shall remain subject to the terms of this Agreement.

        **9.2.3   Resignation**. If the Selling Member sells his or its Member Interest in accordance with this Section 9.2, such Member (or his or its designee) shall immediately tender his written resignation from the Governing Board and/or as an Officer of the Company.

        **9.3   Involuntary Transfers**. If (a) an event of Bankruptcy occurs with respect to a Member; (b) any Unit is attached or garnished; (c) a judgment or decree is obtained in any legal or equitable proceeding against any Member and the Transfer of the Member's Units is threatened under legal process as a result of such judgment; (d) any execution is issued against any Member or against the Member's Units; (e) a Member is adjudicated insolvent; or any other form of legal proceeding or process is commenced or is threatened, against any member by which the Units of any Member may be reasonably anticipated to be sold, either voluntarily or involuntarily, the Company shall have the option (but not the obligation) for so long as such previous condition(s) continue(s), to purchase from such Member or such Member's successor in interest as the case may be, the Member's Units in the Company. Upon exercise of the option to purchase, the Company shall purchase all of the Member's Units at the Purchase Price (hereinafter defined) for such Member's Units in cash to be paid to such selling Member within 120 days of the notice of the exercise of the option to purchase. If the Company does not exercise its option to purchase under this Section 9.3, then the interest of such Member in the Company shall continue as such.

        **9.4   Death, Permanent Disability, Retirement**. Upon the death, Permanent Disability or retirement ("Triggering Event"), the Member, or the estate or personal representative of a deceased Member with respect to whom there has been a Triggering Event (" Withdrawing Member") shall be deemed to have offered for sale to the Company such Withdrawing Member's entire Member Interest in the Company, and the Company shall have the option to purchase all or any part of the Member Interest so offered at the Purchase Price and on the terms set forth in this Agreement by written notice to the Withdrawing Member and all of the other Members within thirty (30) days of the date of the Triggering Event. If the Company fails to exercise its option, the Member Interest of the Withdrawing Member not so purchased by the Company shall be deemed offered to the other Member(s), and such other Member(s) shall have the option within thirty (30) days after the date of expiration of the Company's option to purchase all or any part of such Member Interest at the Purchase Price

and on the terms set forth in this Agreement by written notice to the Withdrawing Member or the estate or personal representative of the Withdrawing Member within said thirty (30) day period. If more than one of the other Member's exercises his option hereunder, such other Members shall purchase the Member Interest of the Withdrawing Member in the proportion that the Member Interests in the Company owned by each other Member bears to the total Members' Interests owned by all of the other Members, or in such other proportion as such other Members may agree. The Company shall purchase any Units of the Withdrawing Member not purchased pursuant to this Section 9.4, such purchase to be at the Purchase Price and on the terms set forth in this Agreement. The Company shall provide written notice to the Withdrawing Member and all of the Members of the purchase of pursuant to this Section 9.4 within ten (10) days after the expiration of the option to the Members. Any Member Interest purchased in accordance with the terms of this Section 9.4 shall be assigned free and clear of all liens and encumbrances. "Closing" shall be held on the date and at the place set forth in the notice of exercise of the option or mandatory purchase, but no later than ninety (90) days after the date of the Triggering Event.

　　　　　9.4.1   **Purchase Price**. The "Value Per Unit" purchased pursuant to this Section 9.4 shall be the Value of the Company divided by the number of Units issued and outstanding immediately prior to the purchase. The "Initial Value" of the Company shall be as listed on "Exhibit A". The Initial Value has been agreed upon by the Members and the Company as representing the aggregate fair value of the Company. The Members hereby mutually agree to sell their Units standing in their names pursuant to the terms of this Agreement at the Initial Value herein stipulated, or at the value stipulated in any proper amendment of this Agreement, or as redetermined as set forth below ("Value of the Company"). The Members and the Company agree to redetermine the Value of the Company and the Members' respective interests therein within sixty (60) days following the end of every Fiscal Year. The redetermined value so agreed upon shall be endorsed on "Exhibit A" attached hereto and made a part of this Agreement and shall be effective as of the first day of the first month of the Fiscal Year in which such redetermination is made. If the Members and the Company fail to make a redetermination of Value of the Company for a particular period, the Value of the Company as of the date of the Triggering Event shall be determined in accordance with the following appraisal method.

　　　　　If the Withdrawing Member and the purchasing Member(s) or the Company, as the case demands, cannot agree upon the Value of the Company within thirty (30) days of the Triggering Event, then either may deliver notice (an "Appraisal Notice") of his or its election to commence the following appraisal. If a party elects to commence the appraisal process, the Purchase Price shall be the fair market value of the Withdrawing Member's Units as determined by appraisal within sixty (60) days following the date of delivery of an appraisal Notice to all parties hereto (the "Appraisal Period"). If the Withdrawing Member and the purchasing Member(s) or the Company do not agree to an appraiser within ten (10) days after the commencement of the Appraisal Period, then either party may, within ten (10) days thereafter, institute an appraiser selection procedure as follows: Within said ten-day period, each party shall name a qualified independent appraiser experienced in the valuation of closely-held businesses, the business conducted by the Company and assets of the kind held by the Company. The two appraisers shall appoint a third similarly qualified appraiser (or, if the appraisers are unable to agree upon a third appraiser within ten (10) days after their mutual appointment, either or both may apply to

the presiding judge of the Pierce County Superior Court to designate such appraiser).  The third appraiser shall be responsible for conducting the appraisal of the Value of the Company.  Each party shall bear the costs associated with the appraiser he or it selects.  The costs associated with the third appraiser shall be split evenly between the parties.  All such costs and expenses incurred by the parties shall not be subject to reimbursement or indemnification by the Company or any Member under any provision of this Agreement.   If either party shall fail to name an appraiser within the allotted time period, the other party's appraiser shall conduct the appraisal.  The appraisers' findings shall be final and binding.

All of the Company's or Member's obligations to a Withdrawing Member for payment of the Purchase Price shall be subject to any and all Properly Evidenced Claims (hereinafter defined) the Company or Member(s) may have against the Withdrawing Member including, without limitation, any claims arising for breach of the Withdrawing Member's performance under this Agreement; provided, however, that any right of set-off may be exercised only by placing any cash amounts due to an Withdrawing Member in escrow.  For purposes hereof, "Properly Evidenced Claims" include rights, claims, set-offs, counterclaims, demands, credits and deductions of any nature whatsoever properly evidenced in writing whether on the books of the Company, or by lien, judgment, note, or order of a court of competent jurisdiction.

9.4.2   **Terms of Purchase**. In the case of the death of a Member, the Purchase Price for his Member Interest purchased under this Section 9.4 herein shall be paid to his Estate within sixty (60) days from the date of such Member's death pursuant to the terms of a promissory note ("Note"), in the form attached hereto as Exhibit "B", to be executed by the purchaser(s) and delivered to the seller at Closing.  If the Company owns insurance on the life of such Withdrawing Member, then the Company shall apply the amount of such proceeds received by it towards payment of the Purchase Price.  Any insurance proceeds received in excess of the Purchase Price shall be retained by the Company.   In the case of the retirement or Permanent Disability of a Member, the Purchase Price for his Member Interest purchased under this Section 9.4 herein shall be paid to such Affected Member within 120 days from the date of such retirement or Permanent Disability pursuant to the terms of a promissory note similar to that of the Note with appropriate modifications regarding the timing of payments.  If the Company owns disability insurance on such Withdrawing Member, then the Company or the Member shall apply the amount of such proceeds received by it or him towards payment of the Purchase Price.  In the case that the Company receives such proceeds, then the excess of such proceeds, after payment of the Purchase Price, shall be retained by the Company.

9.4.3   **Security**. As security for the payment of the unpaid balance of the Purchase Price as evidenced by the Note, the Withdrawing Member shall have a security interest in the purchased Units purchased at the Closing Under the terms of a security agreement (and accompanying financing statements), a form of which is attached hereto as "Exhibit C".  All rights in connection with or incident to the ownership of such Units shall be vested solely in the purchaser, subject to the Withdrawing Member's lien, provided, however, that with respect to any Member Interest purchased by the Company, during the term such Member Interest is subject to the Withdrawing Member's lien, such Member interest shall have no right to vote or to distributions.

G:\JVP\Pacifice\LLCAgr

**9.4.4   Restrictions on Activities of the Company**. So long as there remains an outstanding balance on the Note, the Company agrees not to do any of the following without the consent of the payee of the Note, and a failure to comply with the prohibitions contained herein shall constitute an Event of Default under the terms of the Note:

(1) Materially amend its Certificate of Formation or Operating Agreement;

(2) Issue or sell any Membership Interests, options to acquire a Membership Interest, bonds, notes, or other Company securities;

(3) Sell, assign, or transfer any of its assets except in the ordinary course of business;

(4) Mortgage, pledge, create a security interest in, or otherwise encumber any of its assets, except in the ordinary course of business or in connection with a loan pursuant to (5) below;

(5) Borrow any funds, whether secured or unsecured in an amount in excess of the lesser of (a) ten percent (10%) of annual gross revenues for the preceding year, or (b) $500,000, except in the ordinary course of business;

(6) Declare or pay any dividends or other distributions to Members, except that the Company shall be permitted to distribute to all Members with respect to each year an amount equal to the taxable income of the Company for such year multiplied by the highest marginal rate of federal income tax applicable to ordinary income; or

(7) Merge or consolidate with or into any other Person, or liquidate or dissolve .

**9.5   Insufficient Surplus**. If the Company desires or is required to purchase the Member Interest of a Member hereunder but is prohibited from doing so due to a legal prohibition caused by insufficient capital or there is some other legal prohibition which does not permit it to lawfully purchase such Percentage Interest, then the other Members shall promptly cause or permit the Company to take such appropriate lawful actions, if any, as can be reasonably taken to enable the Company to lawfully purchase and pay for such Percentage Interest.

**9.6      Failure to Transfer**. If any Member whose Member Interest is subject to purchase under this Section 9 does not deliver an assignment of his or its Member Interest to the purchaser as required hereunder, such Member Interest shall be deemed assigned and Transferred to the purchaser upon payment of the Purchase Price in accordance with the terms of this Agreement.

**9.7      Resignation**. If the Withdrawing Member sells his Member Interest in accordance with Section 9.4, such Withdrawing Member (or his or its designee) shall immediately tender his written resignation from the Governing Board and/or as an Officer of the Company.

**9.8      Interests In a Member**. If a Member that is not a natural person ("Entity

G:\JV2\Pacifico\LLCAgr

-24-

Member") causes or permits, without the unanimous consent of the other Members either (i) an ownership interest, direct or indirect (including, but not limited to, via a sale of stock or assets, dissolution, liquidation, merger or consolidation), in itself to be Transferred such that, after the Transfer, (a) the Company would be considered to have terminated within the meaning of section 708 of the Code or (b) without the consent of all of the non-transferring Members, that Member shall cease to be controlled by substantially the same persons who control it as of the date of its admission to the Company; or (ii) without the consent of all of the other Members, its governance (i.e., board of directors or governing board) to cease to be controlled by substantially the same persons who control it as of the date of admission to the Company, ((i) and (ii) shall be referred to a "Change" in the Entity Member) the other Members and the Company shall have the option (in accordance with the procedure set forth in Section 9.4) to purchase the entire Member Interest of such Entity Member with respect to which there has been a Change ("Changed Entity Member"). On exercise of that option, the Changed Entity Member shall sell the Changed Entity Member's Member Interest to the other Members and/or the Company for the Purchase Price, which shall be paid to the Changed Entity Member within sixty (60) days of the notice of the exercise of the option, in cash or wire transfer within forty-five days (45) from the date such notice is given. The Changed Entity Member's Designee shall resign from the Governing Board and from any offices which he or any other individual representing such Changed Entity Member shall hold.

In the case that such other Members consent to the situations effecting the Changed Entity Member as described above and neither the Company nor the other Members exercise their option to purchase the Member Interest of the Changed Entity Member, (i) this Agreement shall continue in full force and effect in accordance with its terms or in accordance with such terms as to which all Members agree (unless all of the Members elect otherwise) , (ii) the Changed Entity Member's, or its successor's Designee on the Governing Board shall continue to be entitled to one (1) vote; (iii) Borzilleri and Pacifico shall continue to serve on the Governing Board with one (1) vote each; and, (iv) for one (1) year after such Change to the Entity Member, (a) the first sentence of Section 7.2 shall, shall be amended to delete the portion that reads, "of which at least one member must be the T&W Designee"; (b) the Chairman of the Governing Board shall be either Pacifico or Borzilleri; and (c) the new Governing Board (after the Change) shall elect new officers, if it so chooses.

9.9    **Transferees**. Subject to the provisions of this Section 9, a Person to whom an interest in the Company is transferred has the right to be admitted to the Company as a Member with the Percentage Interest so transferred to such Person, if (a) the Member making such transfer grants the transferee the right to be so admitted, and (b) such transfer is consented to in accordance with Section 9. If a transferee is not admitted as a Member pursuant to the terms herein, such transferee shall be regarded an "Assignee" of such Member Interest, and shall not be entitled to vote or otherwise be entitled to any right or benefit of a Member except the right to distributions as provided under this Agreement.

9.9.1    **Requirements for Admission**. The Company shall not recognize for any purpose any purported Transfer of all or part of a Member Interest unless and until the other applicable provisions of this Section 9 have been satisfied and the Members (other than the transferor Member) have received, on behalf of the Company, a document (i) executed by both the Member effecting the Transfer and the person to whom the Membership

Interest or part thereof is Transferred, (*ii*) including the notice address of any person to be admitted to the Company as a Member and his/its written agreement to be bound by this Agreement in respect of the Member Interest or part thereof being obtained, (*iii*) setting forth the Percentage Interests after the Transfer of the Member effecting the Transfer and the person to which the Member Interest or part thereof is Transferred  (which together must total the Percentage Interest of the Member effecting the Transfer before the Transfer), and (*iv*) containing a representation and warranty that the Transfer was made in accordance with all applicable laws and regulations (including securities laws). Each Transfer and, if applicable, admission complying with the provisions of this Section 9.9.1 is effective as of the first day of the calendar month immediately succeeding the month in which the Members receive the notification of Transfer and the other requirements of this Section 9 have been met.

9.9.2  **Transfer Requirements**. Prior to the exercise of the right of a Member to Transfer a Member Interest or any part thereof or of any Person to be admitted to the Company in connection therewith to exist or be exercised, (*a*) either (I) the Membership Interest or part thereof subject to the Transfer of admission must be registered under the Securities Act of 1933, as amended, and any applicable state securities laws or (II) the Company must receive a favorable opinion of the Company's legal counsel or of other legal counsel acceptable to the non-transferring Members to the effect that the Transfer or admission is exempt from registration under those laws; and (*b*) the Company must receive a favorable opinion of the Company's legal counsel or of other legal counsel acceptable to the non-transferring Members to the effect that the Transfer or admission, when added to the total of all other sales, assignments, or other Transfers within the preceding twelve (12) months, would not result in the Company's being considered to have terminated within the meaning of the Code. The non-transferring Members, however, may waive the requirements of this Section 9.9.2 in such circumstances as they deem appropriate in their sole discretion.

9.9.3  **Costs of Transfer**.  The Member effecting a Transfer and any Person admitted to the Company in connection therewith shall be jointly and severally responsible to pay, or reimburse the Company for, all costs incurred by the Company in connection with the Transfer or admission (including, without limitation, the legal fees incurred in connection with the legal opinions referred to in Section 9.9.2) on or before the tenth (10th) day after the receipt by that person of the Company's invoice for the amount due. If payment is not made by the date due, the person owing that amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the Applicable Federal Rate.

9.10  **Additional Members**.  Additional Persons may be admitted to the Company as Members and Member Interests may be created and issued to those Persons and to existing Members at the direction of the unanimous consent of the Members. The terms of admission or issuance must specify the Percentage Interests applicable thereto and may provide for the creation of different classes or groups of Members and having different rights, powers, and duties. The Members shall reflect the creation of any new class or group in a written amendment to this Agreement indicating the different rights, powers, and duties, and such an amendment need be executed by all of the Members. Any such admission almost must comply with provisions of this Section 9 and is effective only after the new Member has executed and delivered to the current Members a document including the new Member's notice address and his/its agreement to be bound by this Agreement. The provisions of this Section

C:\WP\Pacifico\LLCAgr

9.10 shall not apply to Transfers of Member Interests.

       9.11   **Joinder**. No Transfer of a Member Interest under any circumstance shall be valid until the transferee signs and delivers to the Company such documents as are necessary to result in the transferee becoming a party to this Agreement to the same extent as though such transferee had joined in the initial execution of this Agreement.

     **10.**    **[intentionally left blank]**

     **11.**    **DISSOLUTION AND TERMINATION.**

       11.1 **Dissolution**.  The Company shall be dissolved upon the occurrence of any of the following events:

          (a)    Unanimous agreement of the Members;

          (b)    Sale or disposition of all or substantially all of the Company assets;

          (c)    Expiration of the term of the Company stated in Section 1.3 hereof; or

          (e)    A Member becoming Bankrupt or executing an assignment for the benefit of creditors, the death, retirement, resignation or expulsion of a Member, the dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company  shall cause a dissolution of the Company, unless within ninety (90) days of the happening of any such aforementioned event, the remaining Member elects to continue the Company.  If the election is made to continue the Company, the business of the Company shall be carried on by the remaining Members and the disassociated Member shall be an Assignee with no rights in the management of the Company.

    No Member shall have the right to dissolve or terminate the Company for any reason other than as set forth above or to withdraw from the Company other than as set forth in Section 9.1 hereof.

       11.2   **Winding Up**.  Upon dissolution of the Company for any reason, the Members or, such person or entity as designated by the Members (in either case, the "Liquidator") shall commence to wind up the affairs of the Company and to liquidate its assets.  The Liquidator shall have the full right and authority to determine the time, manner and terms of any sale or sales of Company property pursuant to such liquidation.  Pending such sales, the Liquidator shall have the right to continue to operate or otherwise deal with the assets of the Company.  A reasonable time shall be allowed for the orderly winding up of the business of the Company and the liquidation of its assets and the discharge of its liabilities to creditors so as to enable the Liquidator to minimize the normal losses attendant upon a liquidation, having due regard to the activity and condition of the relevant markets for the Company properties and general financial and economic conditions. Any Member may be a purchaser of any properties of the Company upon liquidation of the Company's assets, including, without limitation, any liquidation conducted pursuant to a

judicial dissolution or otherwise under judicial supervision; provided, however, that, except in the case of a judicially supervised sale, the purchase price and terms of sale shall be approved by the non-purchasing Member.

       11.3    **Distribution of Cash Upon Dissolution**. Prior to making distributions in dissolution to the Members, the Liquidator shall first pay or make provision for all debts and liabilities of the Company and all expenses of liquidation. Subject to the right of the Liquidator to set up such cash reserves as it may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of liquidation and any other funds of the Company shall be distributed to the Members in accordance with the positive balances of their respective Capital Accounts after taking into account all allocations under this Agreement.

       11.4    **Allocation of Gain and Loss Upon Liquidation**. Any Profits or Losses upon dissolution of the Company or from the sale, conversion, disposition or taking of all or substantially all of the Company's property, including, but not limited to the proceeds of any eminent domain proceeding, insurance awards, or similar capital events) ("Gain on Sale" or "Loss on Sale," respectively) shall be allocated between the Members as follows:

             (a)    Loss on Sale shall be allocated between the Members as follows: first, proportionately to those Members having positive Capital Account balances until all positive Capital Accounts have been reduced to zero; and thereafter, to the Members in proportion to their Percentage Interests.

             (b)  Gain on Sale to the extent available shall be allocated between the Members as follows: first, proportionately to those Members having negative Capital Account balances until all negative balances are eliminated; second, to the Members until the positive balances of the respective Capital Accounts are in the same ratio as such Member's Percentage Interest and thereafter, to the Members in proportion to their Percentage Interests.

       This Section 11.4 is intended to comply with the economic effect equivalence provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(i) and the provisions of this Agreement shall be construed and interpreted to give effect to such intention.

       11.5    **Certificate of Cancellation; Report; Termination**. Upon the dissolution and commencement of winding up of the Company, the Liquidator shall execute and file a certificate of cancellation of the Company. Within a reasonable time following the completion of the liquidation of the Company's assets, the Liquidator shall prepare and furnish to each Member, at the expense of the Company, a statement which shall set forth the assets and liabilities of the Company as of the date of complete liquidation and the amount of each Member's distribution pursuant to Section 11.3 hereof. Upon completion of the liquidation and distribution of all Company funds, the Company shall terminate and the Liquidator shall have the authority to execute and file all documents required to effectuate the termination of the Company.

    **12.**    **CONFLICTS OF INTEREST; CONFIDENTIALITY.**

       12.1    Confidentiality. Each Member acknowledges that it or ... 18 ... ... privy

C:\WT\Ducsfile\LLCAgr

-28-

to confidential or proprietary information relating to the business and affairs of the Company and of each other.  Each Member agrees that it and he, as applicable, shall retain all information relative to the business of the Company and the business of T&W, Borzilleri and Pacifico (each a "Delivering Party") in strict confidence and not to disclose any such information now or hereafter received or obtained from the Delivering Party to any third party without the prior consent of the Delivering Party as the case demands; provided, however, that any such confidential or proprietary information may be disclosed (i) to third parties retained by the Delivering Party on behalf of the Delivering Party (e.g., attorneys, accountants) as shall be necessary to perform services hereunder, (ii) to the extent such information becomes generally available to the public other than as a result of an unauthorized disclosure by a Member or (iii) in the event a Member is compelled to disclose such information in accordance with an order from any court of competent jurisdiction or under any provision of applicable law; provided, however, in such event such Member shall promptly notify the Delivering Party, as the case demands, of such required disclosure and shall furnish only such portion of such information as such Member is legally compelled to disclose. Any breach of this Section 12.1 by a Member will cause irreparable harm to the Delivering Party, as the case demands, which, while substantial, may not be reasonably or adequately compensable by damages. Therefore, in addition to any and all other remedies which may be available to the non-breaching party, whether under this Agreement or by operation of law or in equity, the non-breaching party shall have the right to obtain injunctive relief, both preliminary and permanent, without the posting of bond, restraining or preventing any acts or performances contrary to the terms of this Agreement.  In addition, in the event of any breach which results in litigation, the losing party shall pay to the prevailing party any and all costs and expenses of suit, including any sum which a court adjudges reasonable as attorney fees.

       12.2   Conflict of Interest.  Each Member agrees that if it or he becomes aware of a business opportunity involving the leasing and/or financing of automobiles or related equipment (the "Opportunity"), then such Member shall use reasonable efforts to cause the Opportunity to be offered to the Company before offering the Opportunity to any Person who competes with the Company.   Except as hereinafter provided, during the term of this Agreement, no Member shall directly or indirectly establish, open, be engaged in, or in any manner whatsoever become interested in, directly or indirectly, either as an employee, owner, partner, agent, member or as a stockholder, director or officer of a corporation, or otherwise, a business of the same general character as the business regularly engaged in by Company, namely, automobile and related equipment leasing.  Notwithstanding the preceding sentence, the members shall not be in violation of this Section 12.2 by continuing to conduct their current business operations.

## 13.   AMENDMENTS.

      Except as otherwise provided by law, this Agreement may be amended only upon the

unanimous agreement of the Members.  Any such amendment shall be in writing, dated and signed by all Members.

### 14.   MISCELLANEOUS.

14.1   **Notices**.  Any Notice to the Company or any of the Members required or permitted under this Agreement shall be deemed to have been duly given and received (i) on the date of service, if served personally or sent by telex or facsimile transmission to the party to whom notice is to be given, or (ii) on the fourth day after mailing, if mailed by first class registered or certified mail, postage prepaid, and addressed to the party to whom notice is to be given at the address stated opposite its name set forth below or at the most recent address specified by Notice given to the Company, or (iii) on the next day if sent by a nationally recognized courier for the next day service and so addressed and if there is evidence of acceptance by receipt.  Notices to the Company shall be similarly given and addressed to it at its principal place of business.

|  |  |
|---|---|
| To T&W: | T&W Financial Corporation<br>6416 Pacific Highway East<br>Tacoma, WA  98424<br>Attn:  Mr. Thomas W. Price<br>Tel.: (253) 922-5164<br>Fax: (253) 922-7262 |
| To Borzilleri: | Thomas Borzilleri<br>210 N. University Dr., Suite 100<br>Coral Springs, FL  33071<br>Tel.: (954) 345-1194<br>Fax: (954) 345-2092 |
| To Pacifico: | Joseph David Pacifico<br>6701 Essington Ave.<br>Philadelphia, PA  19153<br>Tel.: (215) 492-1700<br>Fax: (215) 365-7242 |
| With a Copy to: | Norman S. Berson, Esq.<br>Fineman & Bach, P.C.<br>19th Floor<br>1608 Walnut St.<br>Philadelphia, PA  19103-5413<br>Tel.: (215) 893-9300<br>Fax: (215) 893-8719 |

14.2   **Entire Agreement**.  This Agreement constitutes the entire agreement among the parties and supersedes any prior agreement or understanding among them, oral or written, all of which are hereby canceled.  This Agreement may not be modified or amended other than pursuant to Section 13 hereof.

NOV-24-99 WED 11:22 AM   SIGNATURE          FAX NO. 954 345 2092          P. 32

 

14.3    **Agreement Binding Upon Successors and Assigns**. This Agreement shall be binding upon the successors and assigns of the Members.

14.4    **Captions; Pronouns**. The paragraph titles or captions contained in this Agreement are inserted only as a matter of convenience of reference. Such titles and captions in no way define, limit, extend or describe the scope of this Agreement nor the intent of any provision hereof. All pronouns and any variation thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require.

14.5    **Governing Law**. This Agreement shall be governed by and construed in accordance with the internal laws of the state of Washington.

14.6    **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

IN WITNESS WHEREOF the Parties have executed this Agreement.

**T&W:**                      T&W FINANCIAL SERVICES COMPANY L.L.C.

By   T&W FINANCIAL CORPORATION, Manager

By:

Thomas W. Price, President

**BORZILLERI:**

Thomas Borzilleri

**PACIFICO:**

Joseph David Pacifico

C:\…\Pacifico\LLCAgr

Example Illustrating
The Calculation of Servicing Fee

| Date | Ending GAAP  Investment in Leases | Servicing Fee |
|------|-----------------------------------|---------------|
| 9/30/98 | $10,000,000 | .5% |

Based on the above facts, the servicing fee payable to T&W Financial
Services Company L.L.C. for the month of September, 1998 would be
$4,166.67.

($10,000,000 (GAAP investment in leases) x .005 (servicing fee) / 12
(months) = $4,1667).